(No. 49560.—

*In re* JOSEPH C. SALADINO, Attorney, Respondent.

*Opinion filed April 3, 1978.*

RYAN, J., took no part.

Sidney Z. Karasik, of Chicago (Michael Kreloff, of counsel), for respondent.

Philip Schickedanz, of Springfield, for the Administrator of the Attorney Disciplinary Commission.

MR. JUSTICE CLARK delivered the opinion of the court:

In two separate but related complaints, the Administrator of the Attorney Registration and Disciplinary Commission has charged respondent, Joseph C. Saladino, an attorney since his admission to the Illinois bar in June 1950 and presently practicing in South Beloit, Illinois, with conduct which tends to bring the legal profession into disrepute. In the first complaint, count I charged respondent with taking title to premises without the prior approval or consent of the complainant, Mrs. Metha M. Van Hoveln, who had retained respondent to repre-

sent her in the real estate transaction; count II charged respondent with failure to provide the complainant with evidence or security for a loan she made, upon respondent's advice, to United Tool and Engineering Company; and count III charged respondent with the preparation of a series of wills or codicils for the complainant, without her knowledge, under which bequests to him, through the residuary clause, increased substantially. The Hearing Board found no misconduct as to count II, but recommended a reprimand for count I and censure for count III. During its hearing, the Review Board raised questions concerning the preparation and execution of a warranty deed which purportedly transferred title from the respondent to complainant, and concerning his answers before that board. The second complaint was filed as a result of the Review Board's continuance and the Administrator's investigation. On this complaint, the Hearing Board found respondent had given false testimony. The Review Board concluded that the second complaint was "filed as an ancillary" proceeding to the first and "does not warrant separate discipline," and recommended a one-year suspension.

Respondent first met complainant in 1957 when her husband asked respondent for advice. Subsequently, respondent prepared wills for them for which he was paid. In 1959, the husband died. Thereafter the relationship, while remaining that of attorney-client, grew into one of friendship. Indeed, respondent did not charge her for his services. Respondent visited complainant during her hospitalizations, having driven her to the hospitals on occasion. He was listed by her as the individual the hospital authorities should notify if they found it necessary. Apparently, Mrs. Van Hoveln grew dependent on respondent for some things. She had no relatives and few friends in the Rockford-Beloit area where she resided.

Evidence, apropos of count I, discloses that complainant, then 73, asked respondent to represent her in a real estate transaction in 1971. Respondent had handled the sale of a house for her previously. Growing dissatisfied with apartment living, she asked him to look at a small residence, in Beloit, Wisconsin, in which she was interested. Respondent recommended complainant buy it and prepared the deed. The closing was effected in his office September 7, 1971. Present were the sellers, not represented by an attorney; the complainant—the Hearing Board incorrectly found she was not there (the record shows this and the Administrator does not deny it); respondent; and his secretary. Title was taken in respondent's name and in his wife's, Lois Saladino, and the deed was recorded. Until delivery of the warranty deed conveying the property to her on January 5, 1972, a year and a half before the complainant filed a disciplinary grievance, complainant received no document or other evidence of ownership. Respondent maintains, but complainant denies, that before and again after the transaction she was fully informed of and assented to his taking title to the house with his wife. They were acting as trustees for her. He testified that, for her benefit, he compared this "trust-like" procedure to her profitable loan to United Tool which had been under a trust agreement. Respondent testified he was acting in this manner because Wisconsin does not recognize passive or land trusts; yet he was concerned that the "acquisition of this asset" might jeopardize her eligibility for governmental assistance for payment of medical expenses. He was also concerned that her physical condition—she had been hospitalized several times in the previous 10 years—might require a sale of the property at a time when she was incapable of participating in the sale. To protect her interests, respondent said that at the same time (September 7, 1971) he prepared the deed con-

veying the Beloit house from the sellers to him and his wife, he prepared another warranty deed conveying the same property to the complainant. That deed he placed in her file in his office. He also prepared a closing statement in which he showed her as purchaser. When she demanded the property be placed in her name, after discovering, she testified, it was in the Saladinos' name, he told her to come to his office the next day, January 5, 1972. He delivered the deed to her then.

While respondent maintains that his actions were motivated only by his friendship with and concern for Mrs. Van Hoveln, we cannot condone them. We believe respondent may have had good intentions, but we conclude that his actions establish a *prima facie* case of abuse of a fiduciary relationship. In *McFail v. Braden* (1960), 19 Ill. 2d 108, 117-18, this court held:

> "Where a fiduciary relation exists, the burden of proof is on the grantee or beneficiary of an instrument executed during the existence of such relationship to show the fairness of the transaction, that it was equitable and just and that it did not proceed from undue influence. [Citation.] The same rule has application where an attorney engages in a transaction with a client during the existence of the relation and is benefited thereby. [Citation.] Conversely, an attorney is not prohibited from dealing with his client or buying his property, and such contracts, if open, fair and honest, when deliberately made, are as valid as contracts between other parties. [Citation.] *** [I]mportant factors in determining whether a transaction is fair include a showing by the fiduciary (1) that he made a full and frank disclosure of all the relevant information that he had; (2) that the consideration was adequate; and (3) that the

principal had independent advice before completing the transaction." (Accord, *In re Anderson* (1972), 52 Ill. 2d 202, 206.)

Even if we were to characterize respondent's actions as well intentioned, without hint of abuse of trust and confidence, it is clear he exercised poor judgment in taking title to complainant's house. Complainant was without any indicia of ownership. We agree with the boards below that complainant was therefore without adequate protection, for example, from respondent's creditors. Moreover, respondent's claim that a resulting trust could be inferred is weak at best, since that would entail litigation, perhaps extensive litigation.

As to count II, it is clear that complainant did deliver $15,000 to the respondent for him to invest in United Tool, a company he represented. However, both the promissory note and trust deed were payable to him as trustee for complainant. There was, in other words, a trust instrument sufficiently protecting complainant, who received repayment on the loan at 8% interest. On this record, we agree there was no wrongdoing with respect to count II.

The facts of count III of the first complaint are that respondent, who prepared several previous wills or codicils in which he was to receive bequests, was to receive all the residue, after specific bequests, including a diamond ring to Mrs. Saladino, in the last will he prepared for complainant. She signed that on January 5, 1972, the same day the deed for the Beloit house was delivered to her. The complainant, who was seemingly confused or uncertain about other matters in her testimony, did not recall previous wills respondent prepared for her and denied respondent was to be a beneficiary. Respondent, however, asserted that on several occasions, the last time being when complainant was hospitalized in November 1971, complainant had ex-

pressed her desire to make changes in the will and to leave the balance of her estate, after specific bequests, to respondent. He testified that he ignored her requests until she appeared at the office on January 5, 1972, at which time she signed and took the will.

Again, we concur with the boards below. We further specifically agree with the findings of the Review Board that the evidence is not clear and convincing that respondent was actually carrying out complainant's wishes. In *Dial v. Welker* (1927), 328 Ill. 56, 63, this court held:

> "Proof of the relationship of attorney and client, and of the fact that the beneficiary, in whom trust and confidence were reposed by the testator, prepared or procured the preparation of the will by which he profits, raises the presumption that undue influence induced the execution of the will. Such proof casts upon the proponents, if the will is to be sustained, the necessity of producing evidence to show that its execution was the result of free deliberation on the part of the testator and of the deliberate exercise of his judgment." (Accord, *In re Anderson* (1972), 52 Ill. 2d 202, 206.)

We do not see that execution of this will "was the result of free deliberation" or that complainant received independent advice regarding this will.

We do not wish to discourage attorneys from developing close relationships with or from undertaking more responsibility on behalf of clients. Given the position of attorneys in our society, it is not surprising that frequently they become indispensable to their clients. Their advisory role may come to transcend merely the dispensation of legal counsel. Having undertaken such responsibility, however, an attorney is under a duty not to abuse such a relationship and an obligation

to avoid even the appearance of impropriety. In the instant case, respondent maintained such a relationship. (In fact, during the more-than-a-year interval between the acts complained of (on September 7, 1971, and January 5, 1972) and the initial filing of a complaint (on April 30, 1973), complainant continued to rely on respondent. For example, she sought his counsel regarding an urban renewal project in Beloit she thought might affect her, and she named him as "the next responsible person" when she was hospitalized in November 1972.)

The second complaint, and amended complaint, alleged respondent attempted to mislead the hearing and review boards. As evidence of his claim that Mrs. Van Hoveln's interest in her property was protected even though title to it was in his and his wife's names as joint tenants, respondent testified that at the time of the closing and *at the same time* the deed, conveying the Beloit house from the sellers to the Saladinos, was prepared, September 7, 1971, respondent prepared a second deed conveying the house from him and his wife to the complainant. When it was pointed out that the two deeds had a common witness (Christine Dimmel), but had a different second witness (John Kightlinger on the first and Peggy Telfair on the second) and a different notary public (Christine Dimmel on the first and Peggy Telfair on the second) respondent agreed this was so but added "they were all three in my office at the time." He said, at the first hearing on February 28, 1975, that the different notaries were necessary "because my wife came later after the transaction was closed." Then one deed "was recorded and the other one was put in her file."

At the hearing by the Review Board on the first complaint, for which there is no transcript, the case was continued, pending further investigation by the Administrator. The Review Board was troubled by the discrepancy involving the deeds and by respondent's alleged

testimony that the second deed could only have been signed by respondent and his wife and acknowledged by a notary on September 7, 1971.

The deed recites that it was witnessed and acknowledged by Peggy Telfair on September 7, 1971. The notary's certificate shows that her commission expired November 10, 1975. Since a commission is issued for four years and Ms. Telfair had not previously been a notary, she could not have validly witnessed the deed until November 10, 1971, or thereafter. (Her discovery deposition indicates she did not remember the deed, but she testified she would not have signed it until after she became a notary.) Moreover, evidence shows she was not employed by respondent until September 18, 1971.

Before the Hearing Board on the second complaint, a member of the first review board testified that respondent had stated that the deed had been signed by him and Mrs. Saladino and acknowledged by a notary on September 7, 1971; and that respondent had replied it was not possible that the deed could have been signed then but notarized later. Respondent denied, as did one of his attorneys for the proceedings on the first complaint, that he had testified that the second deed was signed and notarized on the same date. He said that the deed had been signed by him on September 7, 1971, but signed by his wife later. He did not know when nor did he see her sign it. It was not acknowledged by a notary or otherwise completed until December 1971, he said. Finally, respondent, at the hearing on the second complaint, stated that Peggy Telfair was employed by him after the closing of September 7, 1971—and, by implication, could not have been present; and he denied he ever attempted to mislead the members of the various boards in the proceedings.

We do not find the evidence clear and convincing that respondent intentionally misled the boards. While

the second hearing board properly accorded great weight to the testimony of the member of the first review board, we believe the second hearing panel actually failed to take into account the findings and testimony of the first hearing board although it took "judicial notice" of the transcript of the first hearing board. Respondent conceded at the *first* hearing that the deeds had different witnesses and different notaries; and that he and Mrs. Saladino did not sign the deed at the same time. His testimony that the deed was prepared by him on September 7, 1971, has remained unchanged. His mistaken testimony that Peggy Telfair, the notary and witness on the second deed, was present at the September 7 closing, could be explained by the almost four-year interval between the closing and hearing. Thus we concur in the Review Board's finding of "no separate discipline," and we interpret that to mean there was no intentional misrepresentation.

Although appropriate factors may always be considered in mitigation, predictability and fairness require a degree of consistency in the selection of sanctions for similar types of misconduct. That degree of consistency can only be achieved if sanctions are based on articulated standards of conduct. These standards must be "derived from the underlying purposes of our disciplinary process, which are to safeguard the public, maintain the integrity of the profession, and protect the administration of justice from reproach." (*In re Kien* (1977), 69 Ill. 2d 355, 366 (Clark, J., concurring in part and dissenting in part); *In re Nowak* (1976), 62 Ill. 2d 279, 283.) Safeguarding the public includes shielding the public from attorneys who fail to protect adequately the pecuniary interests of or who abuse their confidential relationship with clients. (*Cf.* Disciplinary Rule 9–102(B), Illinois Code of Professional Responsibility (1970).) Respondent's actions of taking title to the

house (count I of the first complaint) and of naming himself the sole legatee under the residuary clause of complainant's will without advising her to get independent legal advice (count III of the first complaint) fall into the realm of safeguarding the public.

To safeguard the public, sanctions, which have been imposed, include disbarment, suspension and censure. Where there is intentional fraud, disbarment is warranted. On the other hand, an attorney's lack of care would justify imposition of a sanction less than disbarment. Such sanctions are censure and suspension. The length of the suspension would, of course, depend on the circumstances of the case. However, it should be closely linked to the harm caused or the unreasonable risk created by the lack of care.

Respondent did not cause actual harm; that is, complainant did not suffer any financial loss. However, she was needlessly exposed to risk of such loss: her interest in the house was unprotected, and a significant part of her estate could have gone to respondent. Where an attorney exposes a client to the risk of loss, jeopardizes the freedom or the pecuniary or privacy interests of a client, or otherwise abuses his or her relationship with a client, whether or not the attorney receives an intended advantage, the attorney has breached a duty, owed to a client, of safeguarding the public. Such is the case here. We note that respondent, who is now 58, did not have a prior history of disciplinary action since his admission to the bar in 1950.

The appropriate sanction is that respondent be suspended from the practice of law for a period of 3 months.

*Respondent suspended.*

MR. JUSTICE RYAN took no part in the consideration or decision of this case.