(No. 58623.—

*In re* HARVEY GOLDSTEIN, Attorney, Respondent.

*Opinion filed June 6, 1984.—Rehearing denied September 28, 1984.*

124

Theresa M. Gronkiewicz, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Gordon & Gordon, Ltd., of Chicago (Robert E. Gordon, of counsel), for respondent.

JUSTICE CLARK delivered the opinion of the court:

The respondent, Harvey Goldstein, was admitted to the Illinois bar on November 17, 1952. In August of 1981, the Administrator of the Illinois Attorney Registration and Disciplinary Commission filed a two-count complaint with the Commission's Hearing Board charging respondent with professional misconduct tending to defeat the administration of justice and bring the legal profession into disrepute. Before the matter proceeded to hearing, the Administrator amended the complaint to add two additional counts. Each of the four counts involved the respondent's borrowing of funds from four separate clients. Respondent borrowed a total of $86,000 over a two-year period. In each instance he gave the client a promissory note with a specified interest rate.

The matter was assigned to a panel of the Hearing Board. In its report, the Hearing Board recommended that respondent be suspended from the practice of law

for nine months as a result of the misconduct alleged in the four counts of the amended complaint. The Administrator filed exceptions to the Hearing Board's recommendations. The Review Board of the Attorney Registration and Disciplinary Commission reviewed the matter and filed a report, affirming the findings and conclusions of the Hearing Board in all respects except the Review Board recommended that the more appropriate measure of discipline was suspension from the practice of law for a period of one year. Both respondent and the Administrator filed exceptions to the recommendation of the Review Board.

The Administrator's complaint and amended complaint allege in four counts that respondent borrowed money from four clients without disclosing to them his financial situation, in one instance falsely representing the degree of security he was giving to secure the loan, in one instance misrepresenting the use to which the funds would be put, and in all cases that respondent defaulted on the notes and owed his clients money which he had not paid at the time of the hearings.

During the years 1976, 1977 and 1978, the respondent had a financial interest in two businesses. One business, the International Sporting and Leisure Club (the travel club), was in the business of arranging charter airline trips for its members. The travel club operated through a number of banks, the motor club of an oil company, and other institutions which sent out advertisements for the travel club's trips with their regular monthly mailings. The other business that the respondent was involved in was Forestry Recycling Sawmill (the sawmill), an Illinois limited partnership, of which respondent was the sole general partner. The sawmill was acquired in March of 1977 when the previous owners declared bankruptcy. The sawmill was operated on property owned by the Cook County Forest Preserve Dis-

trict. Respondent made an arrangement with the board of the Cook County Forest Preserve District to receive trees without cost from Cook County and several municipalities. These trees had been cut down because of Dutch elm disease. The sawmill also received trees from private contractors who paid a fee to the sawmill for dumping the trees on Cook County land. The sawmill was used to make lumber and chips which it then sold for a profit. There was evidence in the record to demonstrate that both businesses were having some cash-flow problems in the years 1976 through 1979.

Count I of the amended complaint deals with a loan respondent received from Cecelia Hansen. The respondent represented Mrs. Hansen, a client for a number of years, in the sale of her home, for which she received $39,740.06. The respondent and Mrs. Hansen had discussed the idea of respondent investing the money for Mrs. Hansen. Both Mrs. Hansen and the respondent endorsed the check Mrs. Hansen received in the sale and respondent deposited it in the bank account of the partnership that owned the sawmill. Respondent then gave Mrs. Hansen a personal note for $40,000 in exchange for the funds. The note was to bear interest at 10% per year payable quarterly beginning January 1, 1978. The note was dated May 1977. No principal payments were due until July 1, 1979, and then there were to be monthly payments due until the loan was paid in full in June of 1987. The note was stamped "second mortgage." Mrs. Hansen testified that respondent told her she had a second mortgage on his home. The respondent testified that he told Mrs. Hansen that her note was secured by a "junior mortgage." In reality, the mortgage securing the note was a third mortgage. In any event, the respondent testified that he had assured Mrs. Hansen that the security for the note was more than sufficient to pay off all prior notes and Mrs. Hansen's, if the need arose.

Mrs. Hansen loaned the money directly to the respondent. The respondent then chose to use the money to invest in the sawmill. Respondent never told Mrs. Hansen how the money would be used, and he also never advised her to obtain other counsel regarding his borrowing of funds from her.

Mrs. Hansen testified that respondent had borrowed money from her in the past which he had invested and repaid when due. The respondent defaulted on the payments of the principal on his loan from Mrs. Hansen, but he did continually pay the interest payments. It is clear, however, that the terms of the note were not met.

Count II involved a loan from Otto Pfueffer to respondent. Pfueffer had been a client of respondent's since 1974, and he continues to be the respondent's client to date. In January of 1978, the respondent represented Pfueffer in the sale of some property. Pfueffer and the respondent discussed the possibility of investing the $20,000 Pfueffer had received, in a short-term investment. The respondent suggested that Pfueffer give him the money and that he would invest the money for five or six months in the travel club to be used to finance a mailing of its advertisements. Pfueffer agreed with the respondent's suggestion and the respondent borrowed the money from Pfueffer, giving him a promissory note dated January 1, 1978. The note was due on April 12, 1978, with 1% interest per month. The respondent did not advise Pfueffer to seek outside legal advice concerning their business transaction and he never told Pfueffer of his financial situation. In March of 1978, the respondent took Pfueffer over to the offices of the travel club so that he could take a look around.

When the note became due, it was not paid. Pfueffer requested repayment of the note approximately one year after it was due. The respondent has continued to do legal work for Pfueffer and has not billed him for the

work. The respondent testified that he asked Pfueffer to sign an agreement that legal services rendered to Pfueffer would be subtracted from the balance of the loan at the rate of $60 per hour. Pfueffer did not return the written agreement he was to sign. The respondent testified that he did make payments to Pfueffer and that Pfueffer took a trip to Germany through the travel club without paying for it. Although the note had not been paid in full, the balance of the note was not known with any certainty because of the offset of legal fees.

Count III involved a loan from Dr. Sarah Cobbs in December of 1977. Dr. Cobbs sought the respondent's advice concerning a divorce proceeding which she wished to file against her husband. During this first consultation regarding the divorce, Dr. Cobbs explained that she had $16,550 in a joint account with her husband, and she stated that all the money was hers. Respondent suggested that she withdraw the money, and he offered to invest it for her. Dr. Cobbs withdrew the money and loaned it to respondent. The respondent gave Dr. Cobbs a promissory note dated December 28, 1977, due in six months, with interest at the rate of 12% per year. There was no collateral on the loan. The respondent then showed her the literature from the travel club. The loan was made to respondent, and he did not advise Dr. Cobbs to seek outside counsel in regard to the loan.

On June 28, 1978, the due date of the note, the note was not paid. Dr. Cobbs testified that she asked respondent for the money on several occasions until he finally told her that he did not have the money to pay the note. In July of 1980, Dr. Cobbs sought the advice of another lawyer regarding the loan. Suit was filed against respondent, and he made two $500 payments in 1981, with the balance still due at the time of the hearing.

Count IV involved a loan from Ahmad Yusuf to respondent for $10,000 in May of 1976. Respondent had

represented Yusuf since 1974. Mr. Yusuf had some difficulty testifying because there was a language barrier. The testimony of respondent and Yusuf was conflicting on whether Yusuf offered to loan respondent the money or whether respondent solicited the loan from Yusuf. The testimony is also conflicting as to whether respondent told Yusuf the money would be invested in the travel club or in a bank. The respondent testified that he explained the relationship that the travel club had with various banks but never told Yusuf that the money would be invested in a bank. Yusuf borrowed $10,000 at 7½% interest and loaned it to respondent for a year at 12% interest. Yusuf secured the loan he had with the bank by mortgaging a building he owned. The respondent was supposed to make payments directly to Yusuf's bank. After respondent made one payment, Yusuf sold the building that he had used as security for the loan and used the money he had received to repay the bank on his loan. The respondent was then supposed to send the payments to Yusuf instead of the bank. When respondent failed to make the payments, Yusuf hired another attorney to help him collect the money respondent owed him. The respondent did not at any time advise Yusuf to seek outside legal advice regarding the loan.

It is clear that in all four cases where respondent borrowed money from his clients they were loaning the money to him personally, based on his promise to pay. None of them were investing the money directly in the two businesses with which respondent was involved. Respondent never disclosed his financial situation to any of these persons and never advised any of them to seek other counsel in connection with their business dealings with him.

In its report, the Hearing Board stated:

"Respondent fully intended to repay the funds borrowed from his clients and he has made every effort to

do so despite the failure of the two businesses in which he was involved and in which he lost substantial monies and the depressed state of his legal practice. Respondent did not borrow the funds with the intention of absconding with them or of cheating his clients. Nonetheless Respondent did not deal with his clients in a professional manner; he caused them to be deprived of their funds and to incur expense in having to engage other counsel in an attempt to collect their funds from Respondent.

With respect to each of the four counts, it is the conclusion of the Hearing Panel that Respondent entered into a business transaction with a client without full disclosure to the client and with interests adverse to those of the client in violation of D.R. 5—104(A) of the Illinois Code of Professional Responsibility.

With respect to each count, it is the conclusion of the Hearing Panel that Respondent over-reached the attorney-client relationship and caused damage to his clients in violation of D.R. 7—102(A)(3) of the Illinois Code of Professional Responsibility.

With respect to each count, it is the conclusion of the Hearing Panel that Respondent failed to properly protect the interests of his clients.

With respect to Count I involving Cecelia Hansen, it is the conclusion of the Hearing Panel that Respondent engaged in conduct involving misrepresentation in his representing to Hansen that her note was secured by a security interest in property higher than it was in fact secured in violation of D.R. 2—101(A)(4) of the Illinois Code of Profession[al] Responsibility.

It is the recommendation of the Hearing Panel that Respondent be suspended from the practice of law for a period of nine months."

The Review Board, as we previously noted, affirmed the Hearing Board's report in all respects except it increased the length of suspension from nine months to one year.

The only issue that is before this court is the type and length of the sanction to be imposed in this case.

The facts are really not in dispute. Respondent argues that he should be placed on probationary suspension or, at the very most, receive a nine-month suspension, the Hearing Board's recommendation. The Administrator argues that this court should suspend the respondent from the practice of law for two years.

We do not believe that probationary suspension, which is provided for by our Rule 771 (94 Ill. 2d R. 771(f)), would be appropriate in the instant case. In those cases where probationary suspension has been imposed, there has been evidence in the record that the attorney-respondent suffered from "a *disability* which [was] temporary or minor and [did] not require treatment and transfer to inactive status" (emphasis added), a qualification which is required for probation under our Rule 772 (94 Ill. 2d R. 772(a)(3)). In this case, there was no evidence that the respondent was suffering from a temporary or minor disability. His financial difficulties can hardly be said to qualify as a "disability," and therefore we do not believe that probationary suspension would be a proper sanction in the case at bar.

Since we do not agree with and reject respondent's suggestion that his conduct merits a lenient sanction such as probationary suspension or censure, the remaining question becomes the degree of suspension to be imposed. We agree with the Review Board that a one-year suspension is the appropriate sanction under the facts and circumstances of this case, but we are concerned that the respondent has not made restitution.

It is clear that the purpose of attorney disciplinary proceedings is to safeguard the public and maintain the integrity of the legal profession. (*In re Levin* (1979), 77 Ill. 2d 205, 211.) While we recognize the need to attempt to be uniform in the sanctions imposed in these cases (*In re Clayter* (1980), 78 Ill. 2d 276, 283), we are also cognizant of the fact that each case presents a unique factual

situation and must therefore be carefully evaluated based on its own merits (*In re Hopper* (1981), 85 Ill. 2d 318, 324).

While we accept the finding of the Hearing Board that respondent intended to repay the money he borrowed from his clients and has attempted to do so, we also agree with the Hearing Board's finding that the respondent has not dealt with his clients in a professional manner, causing them to be deprived of their funds and to incur expense in engaging other counsel to represent them in their efforts to collect their money from him. We do believe that respondent's previously unblemished record is a factor to be considered in mitigation, and we do not therefore agree with the Administrator that a two-year suspension is warranted. We believe that one year is a sufficient time period to impress upon the respondent the necessity for full disclosure in a business transaction with a client and the impropriety of taking advantage of the attorney-client relationship to the extent that a client's interests are not adequately protected and he or she suffers financial damage.

On this record, we accept in part the recommendation of the Review Board that the interests of the public, the legal profession and respondent would best be served by a suspension for one year. However, while the Administrator has not argued for restitution as a condition of reinstatement, we believe that the respondent should repay the loans from his clients prior to again entering into the practice of law. According to the record before us he has not fully repaid any of his clients or former clients who are the subject of this disciplinary action, and while the amount due to Otto Pfueffer under count II of the Administrator's amended complaint may be somewhat confusing due to his continuing to represent him

without charging a fee and providing him with a free trip to Germany through the travel club, we feel that the amount can be resolved.

We therefore suspend respondent for one year and until further order of this court, conditioned on complete restitution to all the clients named herein.

*Respondent suspended.*