Docket No. 87565–Agenda 23–September 1999.

 
In re
 WILLIAM NELSON TWOHEY, Attorney, Respondent.

Opinion filed March 23, 2000.

JUSTICE BILANDIC delivered the opinion of the court:

The Administrator of the Attorney Registration and Disciplinary Commission (Administrator) filed a complaint with the Hearing Board charging respondent, William Nelson Twohey, with various instances of misconduct evolving from his advising a client to loan funds to Fox River Minerals, Inc., a corporation that respondent represented in his capacity as an attorney. The Hearing Board found that respondent had violated numerous provisions of the Illinois Rules of Professional Conduct (134 Ill. 2d R. 1.1 
et seq
.). The Hearing Board recommended that respondent be suspended from the practice of law for one year, but that respondent should not be ordered to pay restitution to his client. The Review Board adopted the factual findings of the Hearing Board, agreed that restitution was not proper in this case, but reduced the recommended suspension to a period of six months. This court granted respondent’s petition for leave to file exceptions. See 166 Ill. 2d R. 753(e). Respondent challenges only the recommended sanction of six months’ suspension.

For the reasons that follow, we approve the recommendation of the Review Board, and we approve in part and reject in part the recommendation of the Hearing Board. Respondent is suspended from the practice of law for six months.

BACKGROUND

I. The Evidence

Respondent is 60 years old and was admitted to the practice of law in Illinois in 1967. Respondent has been a resident of Ottawa, Illinois, for most of his life. Respondent is a sole practitioner with a general practice in Ottawa. Respondent has no prior disciplinary complaints against him.

A. 
Respondent’s Relationship with Fox River Minerals, Inc.

Fox River Minerals, Inc. (FRM), was a sand processing company located in Seneca, Illinois. FRM was incorporated and began operations in 1991. According to the record, the sand processing business involves significant start-up costs and large operating expenses. There is no revenue until sand sales begin. FRM was significantly undercapitalized and had substantial debt and ongoing cash-flow problems.

In June 1992, respondent became legal counsel for FRM. In early September 1992, respondent became the sole signatory on a bank account referred to as FRM’s “special account,” into which all receipts were deposited. Respondent wrote checks from the special account to creditors and transferred money into a payroll account as needed. Respondent worked an average of 15 to 20 hours per week for FRM. From approximately October 1992 through August 1993, FRM paid respondent $500 per week for his work.

As of September 3, 1992, FRM owed creditors approximately $400,000. This figure included two liens totaling $83,000 that were not reflected on FRM’s accounts payable statements. On July 22, 1992, the Internal Revenue Service filed a $14,000 tax lien against FRM. Respondent testified that he was not aware of this lien until approximately October 1992. William Peabody, the accountant for FRM, testified that the tax lien was sent to the FRM post office box. Peabody testified that he was aware of the lien immediately, but that he did not recall discussing the matter with respondent, and that he did not recall forwarding a copy of the tax lien to respondent.

Also on July 22, 1992, Serena Construction Company (Serena) filed a mechanic’s lien against FRM in the amount of $69,000. Respondent testified that he was not aware in August 1992 of the actual filing of the mechanic’s lien. William Peabody testified that he too was not aware at this time that Serena had filed a mechanic’s lien. Respondent testified, however, that he was aware of a claim by Serena against FRM, but that the parties disputed the amount owed. Respondent was also aware in late September 1992 that Serena had actually filed a lawsuit against FRM.

On July 23, 1992, respondent accompanied David Remy, FRM’s chief executive officer and principal stock holder, to a meeting where Remy signed a “promissory note” in the amount of $120,000 payable to Joseph Thoesen. This note provided that it was secured by an assignment of all of Remy’s stock in FRM. Thoesen testified that this was a “personal loan” by him to Remy as a “capital infusion” into FRM. Respondent testified that he was present when Remy signed the note. Respondent believed that Thoesen had made a capital investment of $120,000 in FRM and was not in the position of a lender or creditor. Respondent therefore advised Remy not to sign the note. Respondent was informed that, even though Thoesen was an investor in FRM, and not a creditor, “[t]his was their way of accounting, of keeping track, and that this was a receipt system.” David Remy died in June 1994, and therefore did not testify at the hearing in this case.

B. 
Respondent’s Relationship with Nancy Weck

Respondent represented Nancy Weck and her husband, Peter Weck, in various legal matters for several years. Peter Weck died in August 1991. Nancy Weck was left with assets including a commercial rental property in Ottawa and approximately $140,000. Respondent continued to represent Nancy Weck. In 1992, respondent represented Weck in a lawsuit in which Weck sought damages against an oil company for environmental contamination of the commercial rental property. Respondent also reviewed lease agreements for this property, and he prepared a will for Weck.

C. 
Financial Transactions Involving Respondent, FRM, and Nancy Weck

The disciplinary charges against respondent center on three monetary transactions involving respondent, FRM, and Weck, which occurred on August 5, 1992, a day in late September 1992, and October 23, 1992.

Transaction of August 5, 1992

On August 5, 1992, Weck went to respondent’s office to discuss her legal matters. Weck and respondent discussed Weck’s finances. Weck had approximately $142,000 in liquid assets. She had deposited this money in a bank account. Respondent suggested that Weck invest money in FRM so that she would receive a better rate of return. Respondent told Weck about FRM’s favorable earnings projections. FRM was located near prospective sand buyers, and there were estimates of significant sand reserves on FRM’s site. Respondent told Weck that his wife was planning to invest in FRM. Respondent’s wife did in fact later invest approximately $16,000 in FRM. Although respondent did not inform Weck of FRM’s debts, Weck was advised that the company was in the start-up phase, had significant start-up expenses, and needed a loan to meet operating expenses.

Weck loaned FRM $15,000. David Remy signed a promissory note, which was prepared by respondent, stating that the note was due on October 1, 1992, and would bear interest of $2,500 for the period of the loan. As collateral for the loan, Remy executed a document that purported to assign to Weck 10% of Remy’s unencumbered stock in FRM. This assignment recited that Remy owned 100% of the stock in FRM. It also stated that Remy had previously pledged or transferred 45% of the stock and owned 55% of the stock unencumbered.

Respondent did not advise Weck that Remy had no unencumbered stock because of the earlier assignment of all of his shares to Joseph Thoesen as collateral for the $120,000 “promissory note.” Respondent testified that, although he knew of Remy’s assignment of his shares to Thoesen, respondent thought that other unencumbered shares were available.

Transaction of September 1992

Weck met with respondent in late September 1992 and wrote a check to FRM for $5,000. At this point, Weck converted her position, for the full $20,000 that she had advanced, from a loan to an equity investment. Pursuant to this arrangement, Weck was to receive 5% of the outstanding stock in FRM. The only stock outstanding, however, was the 1,000 shares originally owned by Remy. Respondent did not advise Weck that Remy had pledged all of his shares as collateral to Thoesen.

Respondent deposited Weck’s $5,000 check into FRM’s special account. This money was used to cover payroll expenses, including respondent’s retainer. Weck knew that FRM needed funds to cover payroll, but respondent did not tell Weck that some of her funds would be used to pay his fees.

Conflicting testimony was presented as to whether Weck first discussed the additional $5,000 with Remy, or whether respondent approached Weck about the additional loan. Weck testified that she was concerned about advancing additional funds, but that respondent assured her that she would soon be receiving a large amount of money from the environmental contamination lawsuit in which respondent was representing Weck. Respondent also told Weck that if she did not loan the additional $5,000 to FRM, she would lose the money that she had already loaned to the company. Weck further testified that respondent suggested that she convert her position to an equity investor, rather than a creditor, as that would be the most effective way to obtain the highest return, given FRM’s projected sales. Weck never received any stock certificates or documentation reflecting her stock ownership.

Weck later told her boyfriend, now her husband, George Weems, that she had loaned money to FRM. Weems was a close friend of respondent. Weems was familiar with FRM and its financial condition, and advised Weck not to invest any further in the company.

Transaction of October 23, 1992

In mid October 1992, FRM was financially unstable. Several payroll checks had been returned for insufficient funds. On October 23, 1992, Weck went to Leland National Bank and met with respondent and bank president Robert Higgerson. Weck obtained a $20,000 loan and invested that money in FRM. Conflicting testimony was presented about the circumstances surrounding the making of this loan.

Weck testified that in October 1992, she met with Remy and he told her that FRM still needed funds. Weck informed him that she could not afford to invest any more money. At this time, respondent became “very pushy” in regard to Weck providing more money to FRM. Respondent would call Weck frequently and leave messages regarding the need to speak with Weck about FRM’s need for more money. Carole Gulo, a friend and neighbor of Weck, testified that she heard several messages on Weck’s machine from respondent. These messages referred generally to respondent’s need to discuss a money situation with Weck.

Weck further testified that on October 22, 1992, respondent called Weck and, during their conversation, respondent “demanded” that she meet him at Leland National Bank the next morning. Respondent informed Weck that he had discussed a loan with Higgerson, the bank president, and arrangements were made for the loan to be signed at 10 a.m. Weck agreed to go to the bank because she “didn’t know what else to do.” Weck, respondent, and Higgerson met at the bank the next day. Higgerson testified that he advised Weck that it would be an unsound investment to give FRM more money. Nevertheless, Weck borrowed $20,000 from the bank to invest in FRM. This decision was made after Weck and respondent conferred in private for several minutes. Higgerson testified that this private conference was a mutual idea between respondent and Weck. Higgerson did not hear raised voices while respondent and Weck conferred privately in a room adjoining Higgerson’s office, and Weck did not appear upset after this conference.

Respondent testified that, during their private conference, Weck told him that she was concerned because she appeared to be the only investor in FRM. Respondent told Weck that he was not able to invest in FRM because he was facing possible bankruptcy due to substantial medical bills he had incurred. Respondent proposed that, if Weck lost money, he would indemnify Weck out of any contingent fee he received in the environmental contamination suit in which he was representing Weck. On November 11, 1992, respondent wrote a letter to Weck memorializing this commitment.

In contrast, Weck testified that, during their private conference, respondent told her that she would lose her prior investment if she did not advance the $20,000. Weck acknowledged that respondent told her about FRM’s financial condition, and that he offered to personally guarantee Weck’s loan. Weck also testified that respondent threatened to reveal her relationship with George Weems, Weck’s boyfriend and now husband, who was married to someone else at the time. Respondent denied making such a threat.

David Remy executed a promissory note and another stock assignment to Weck as collateral for the October 23 loan. Respondent drafted these documents and presented them to Weck. The assignment stated that Remy owned 100% of the shares of FRM, 54% of those shares had been previously pledged or sold, and Remy retained 46% of the shares unencumbered, of which he assigned 5% to Weck as collateral for this loan. Respondent did not tell Weck that all of Remy’s stock was already pledged as collateral to Joseph Thoesen, and respondent did not tell Weck of the debt owed to Thoesen.

FRM filed for bankruptcy in 1993, and Weck lost her $40,000 investment. Weck was paid some interest due on her loan from Leland National Bank. Weck herself, however, repaid the principal of this bank loan. Weck filed a civil lawsuit against respondent. That suit was pending at the time of the hearing in this case.

Respondent testified at the hearing that, when he advised Weck to invest in FRM, he did not perceive a conflict of interest. Attorney Anthony Raccuglia testified as a character witness for respondent. Raccuglia has known respondent for 30 years. He testified that respondent has a reputation for being an ethical and skilled attorney. Edward Whitney, a former Ottawa police chief, a member of the Ottawa city council, and the commissioner of public health and safety, testified that he has known respondent for 45 years and that respondent is well respected and has a reputation for being honest.

II. The Hearing Board and Review Board

The Hearing Board found that the Administrator proved by clear and convincing evidence that respondent (1) breached his fiduciary duty; (2) represented a client when the representation was materially limited by respondent’s responsibilities to another client, or by respondent’s own interests, without full disclosure and the client’s consent, in violation of Rule 1.7(b) of the Illinois Rules of Professional Conduct (134 Ill. 2d R. 1.7(b)); (3) represented multiple clients in a single matter without an explanation to each client of the risks involved, in violation of Rule 1.7(c) (134 Ill. 2d R. 1.7(c)); (4) entered into a business transaction with a client without full disclosure, in violation of Rule 1.8(a) (134 Ill. 2d R. 1.8(a)); (5) made a statement of material fact or law that respondent reasonably should have known was false, in violation of Rule 4.1(a) (134 Ill. 2d R. 4.1(a)); and (6) engaged in conduct that tends to defeat the administration of justice or to bring the courts or the legal profession into disrepute, in violation of Supreme Court Rule 771 (134 Ill. 2d R. 771). The Hearing Board found, however, that the Administrator failed to prove by clear and convincing evidence that respondent engaged in conduct that involves dishonesty, fraud, deceit, or misrepresentation, in violation of Rule 8.4(a)(4) of the Illinois Rules of Professional Conduct (134 Ill. 2d R. 8.4(a)(4)).

The Hearing Board recommended that respondent be suspended from the practice of law for one year. The Hearing Board rejected the Administrator’s request that respondent be ordered to pay restitution to his client.

Respondent filed exceptions before the Review Board. Respondent did not dispute the Hearing Board’s findings but argued that the one-year suspension is excessive. The Review Board affirmed the findings of misconduct yet recommended a six-month suspension from the practice of law. The Review Board agreed with the Hearing Board that restitution is not proper under the facts of this case.

ANALYSIS

Neither party challenges the Hearing Board’s factual findings. The sole issue in this case is the appropriate sanction to impose upon respondent. Respondent argues that he should receive either a sanction of censure or a sanction of less than six months’ suspension. The Administrator argues that respondent’s misconduct and the aggravating factors warrant a suspension of his law license for one year, and that respondent should be ordered to pay restitution to his client.

In determining the appropriate sanction, the recommendations of the Hearing and Review Boards are advisory. The ultimate responsibility for imposing discipline rests with this court. 
In re Chandler
, 161 Ill. 2d 459, 472-73 (1994); 
In re Demuth
, 126 Ill. 2d 1, 13 (1988). A sanction imposed upon an attorney should be generally consistent with sanctions imposed upon other attorneys for similar misconduct. 
In re Smith
, 168 Ill. 2d 269, 296 (1995); 
In re Goldstein
, 103 Ill. 2d 123, 131 (1984). Nonetheless, each case presents a unique factual situation and must be evaluated based upon its own merits. 
Smith
, 168 Ill. 2d at 296; 
Goldstein
, 103 Ill. 2d at 131-32.

In any disciplinary proceeding, this court’s goal is not to punish the attorney. Rather, the goals are to protect the public from incompetent or unscrupulous attorneys, maintain the integrity of the profession, and protect the administration of justice from reproach. 
Smith
, 168 Ill. 2d at 295; 
Demuth
, 126 Ill. 2d at 13. In this regard, it is important to recognize the deterrent value of a sanction and the need to impress upon others the seriousness of the misconduct at issue. 
In re Discipio
, 163 Ill. 2d 515, 528 (1994); 
In re Imming
, 131 Ill. 2d 239, 261 (1989). We consider these principles in determining the proper sanction to impose upon respondent.

We find the following cases instructive and relative to our determination of the proper sanction: 
In re Imming
, 131 Ill. 2d 239 (1989); 
In re Demuth
, 126 Ill. 2d 1 (1988); 
In re Rosin
, 118 Ill. 2d 365 (1987); and 
In re Goldstein
, 103 Ill. 2d 123 (1984).

In 
In re Imming
, 131 Ill. 2d 239 (1989), the respondent attorney induced eight clients to loan substantial amounts of money to a financially distressed plastics manufacturing company, of which Imming was the president and sole shareholder. Imming never disclosed the financial problems of the company to the clients and took affirmative steps to falsify the company’s financial condition. Imming also failed to advise these clients to seek independent legal advice before completing the transactions. The company issued unsecured promissory notes to these clients, and Imming personally guaranteed the repayment of the loans. The company never earned a profit, and Imming ultimately filed for bankruptcy. In determining the appropriate sanction, this court noted that Imming had been an attorney for 26 years and had no prior disciplinary record. We nevertheless stated that Imming’s misconduct was serious and that Imming did not recognize the importance of his ethical obligations. This court ordered that Imming be suspended from the practice of law for two years. 
Imming
, 131 Ill. 2d at 242-50, 260-61.

Likewise, in 
In re Demuth
, 126 Ill. 2d 1 (1988), the respondent attorney represented both a lender and a borrower in a transaction involving a loan of $18,000. Demuth deposited the lender’s check in an escrow account and retained $2,000 from the loan as a “finder’s fee.” At one point before the borrower received the remaining $16,000, Demuth’s escrow account had a balance of 11 cents. Demuth also told the lender that he would file the documents necessary to perfect the lender’s security interest, yet failed to do so. The loan was never repaid to the lender. In an unrelated transaction, Demuth himself borrowed $11,600 from the same client/lender involved in the $18,000 transaction. Demuth failed to advise the client to obtain independent legal advice. Demuth defaulted on the $11,600 loan, and the client sued Demuth to collect on the loan. This court determined that the appropriate sanction was suspension from the practice of law for one year. We recognized that Demuth had an otherwise unblemished record in his 11-year career, that the misconduct at issue had occurred eight years earlier, and that Demuth had ultimately made restitution to his client. Furthermore, a character witness had testified that Demuth was active in community affairs and various youth groups. Nevertheless, this court held that a one-year suspension was the appropriate sanction, as Demuth’s misconduct was serious and it appeared that Demuth “still [did] not fully understand his ethical obligations.” 
Demuth
, 126 Ill. 2d at 5-8, 14-15.

Similarly, in 
In re Rosin
, 118 Ill. 2d 365 (1987), the respondent attorney represented a medically and financially unstable client in a personal injury action that the parties ultimately settled. Rosin later drafted, without advance authorization from the client, an investment agreement pursuant to which the client loaned $100,000 of the proceeds from the settlement to a company that sold collectors’ stamps. Robert McAuliffe, then a judge in the circuit court of Cook County, managed and directed the operation of this company. Rosin tried several cases before McAuliffe and also had a close personal relationship with him. Rosin failed to investigate the company to insure that the client’s investment was sound, and failed to draft adequate security provisions in the investment agreement. Rosin himself also loaned a significant sum of money to the company without first communicating this information to his client. This court noted that, although Rosin did not intentionally defraud his client, and had no prior history of disciplinary action, he had put his client at considerable pecuniary risk. This court suspended Rosin from the practice of law for two years and until further order of the court, or, if he paid the client the monies lost by her as a result of his misconduct, plus interest, within 60 days, then his suspension would terminate at the end of two years. 
Rosin
, 118 Ill. 2d at 368-78, 382, 388-89.

Finally, in 
In re Goldstein
, 103 Ill. 2d 123 (1984), the respondent attorney borrowed funds totaling $86,000 from four clients over a period of two years. Goldstein used this money to invest in two financially distressed companies with which he was involved. Goldstein did not disclose to his clients the use to which the borrowed funds would be put, and failed to advise his clients to seek independent legal counsel. Goldstein gave each client a promissory note. In one case, Goldstein falsely represented the degree of security he was giving for the loan. In all four cases, Goldstein defaulted on the payments of the principal of the loans and had not made full restitution to his clients. This court suspended Goldstein from the practice of law for one year and until further order of the court, conditioned upon payment of restitution. We noted that Goldstein intended to repay the money he borrowed from his clients, and that he had no prior disciplinary record. We stated, however, that Goldstein failed to deal with his clients in a professional manner, caused them to be deprived of their money, and caused them to incur expense in seeking to recover the money. 
Goldstein
, 103 Ill. 2d at 125-29, 132-33.

We consider the aforementioned case law, as well as the particular mitigating and aggravating factors in this case, in determining the appropriate sanction to impose upon respondent. Here, respondent’s misconduct was serious but did not involve fraud or deliberate misrepresentations. It is undisputed that respondent had an attorney-client relationship with both Weck and FRM during August, September and October of 1992. At this time, respondent was preparing a will for Weck, assisting her with rental documents pertaining to her commercial building, and had agreed to represent her in the environmental contamination suit. Also at this time, FRM was paying respondent to handle the company’s financial matters, which included dealing with FRM’s many creditors.

Because respondent had an attorney-client relationship with Weck and FRM, he also had a fiduciary relationship with both of them. See 
Imming
, 131 Ill. 2d at 252-53. At the same time that respondent represented both Weck and FRM, however, Weck, pursuant to respondent’s advice and assistance, loaned $40,000 to FRM and became one of FRM’s creditors. On three separate occasions, respondent advised Weck to invest money in FRM. At no time did respondent inform Weck of his conflict of interest or advise Weck to seek independent counsel or advice. Respondent’s failure to recognize such a clear conflict of interest in his representation of both a lender and a borrower reveals a lack of understanding of his ethical obligations as an attorney. See 
Demuth
, 126 Ill. 2d at 13.

Nevertheless, the circumstances of this case differ from those in the cited cases. 
Imming
, 
Demuth
, 
Rosin
, and 
Goldstein
 involve more serious misconduct and greater aggravating circumstances than are present here. The Hearing Board found that the Administrator failed to prove that respondent engaged in fraud or misrepresentation. The parties do not dispute this finding. Respondent thought that FRM was a good investment and that it would produce a profit once it endured the start-up phase. Indeed, respondent agreed that if Weck lost money, he would indemnify Weck out of any contingent fee he received in the environmental contamination suit in which he was representing her.

Furthermore, respondent himself did not borrow money from Weck. Rather, he told Weck about a potential investment in a start-up company. Respondent told Weck that her money would be invested in FRM, and her money was in fact invested in and used by FRM. Although respondent received financial compensation from FRM, he did substantial legal work on its behalf, and he did not receive any additional compensation as a result of the transactions with Weck.

We also recognize the importance of certain mitigating factors present in this case. Respondent has been practicing law for over 30 years and has no prior disciplinary complaints against him. Respondent has been cooperative throughout the entire disciplinary process, and evidence at the hearing revealed that respondent has a reputation for honesty and integrity with certain members of his community.

In light of respondent’s misconduct, and the mitigating evidence presented in this case, a six-month suspension from the practice of law is the appropriate sanction. In rendering this sanction, we stress the importance of an attorney’s fiduciary duty to his or her client and the requirement of full disclosure in a business transaction with a client.

Justice Rathje’s dissenting opinion concludes that respondent should be suspended for two years and until further order of the court, and that respondent should be ordered to pay restitution.  His dissent reasons that the aforementioned case law dictates this result. It states that, like respondent’s case, there were no findings of fraud or misrepresentation in 
Imming
, 
Rosin
, or 
Demuth
, and like respondent’s case, the attorneys in 
Imming
, 
Rosin
, 
Demuth
, and 
Goldstein
 had no prior history of disciplinary action. The dissent then criticizes our suspension of respondent for six months because this suspension is shorter than the one- and two-year suspensions imposed in the referenced cases.

We, of course, agree that there are similarities between the facts of respondent’s case and the facts of 
Imming
, 
Rosin
, 
Demuth
, and 
Goldstein
. This is why we discuss these cases as a starting point in determining the appropriate sanction for respondent. There are, however, important differences between the facts of respondent’s case and the facts of the aforementioned cases, which make a lesser sanction appropriate here.

Respondent advised Weck to invest $40,000 in FRM, a company in which respondent was not a shareholder. Imming, on the other hand, induced eight clients, on numerous occasions over a four-year period, to invest a total of $389,000 in a company in which Imming was the president and sole shareholder. 
Imming
, 131 Ill. 2d at 242-50. In 
Rosin
, the Administrator cited in aggravation uncharged conduct that came to light during the course of the investigation, 
i.e.
, that Rosin did not follow the rules governing the payment of fees to a lawyer who refers a case to another lawyer, and that Rosin loaned $60,000 to a company controlled by a judge before whom Rosin practiced. 
Rosin
, 118 Ill. 2d at 388. No such aggravating evidence appears in respondent’s case. In 
Demuth
, this court affirmed the Hearing Board’s finding that Demuth converted client funds. 
Demuth
, 126 Ill. 2d at 11-12. No such charge was brought against respondent in this case. Finally, as Justice Rathje’s dissent recognizes, unlike respondent’s case, the 
Goldstein
 case involved a finding of misrepresentation. See 
Goldstein
, 103 Ill. 2d at 130.

Because respondent’s case involves fewer aggravating circumstances than the foregoing cases, a suspension shorter than one or two years is the appropriate sanction. Furthermore, as we have previously stated, each attorney disciplinary proceeding presents unique facts, and we must therefore carefully evaluate each case on its own merits. See 
Smith
, 168 Ill. 2d at 296; 
Goldstein
, 103 Ill. 2d at 131-32. In this case, after a thorough review of all of the relevant circumstances, we determine that respondent should be suspended from the practice of law for six months.

As a final matter, we hold that restitution is not appropriate under the facts of this case. Respondent did not commit fraud or make deliberate misrepresentations. Rather, respondent believed that FRM would ultimately be successful and was thus a good investment. Respondent did provide Weck with some negative information about FRM, including the fact that it was a start-up company and had problems meeting its payroll. Additionally, the Hearing Board found that Weck had more business acumen than she claimed, and was generally aware of the risks involved in investing in FRM.

Justice Rathje’s dissent contends that respondent should be required to pay restitution to Weck. In support, the dissent cites 
In re Fleischman
, 135 Ill. 2d 488 (1990), and 
In re Alexander
, 128 Ill. 2d 524 (1989). In those cases, the attorneys had been disbarred for bribing employees of the Cook County board of tax appeals, and were seeking reinstatement to the practice of law. 
Fleischman
, 135 Ill. 2d at 490-95; 
Alexander
, 128 Ill. 2d at 527-33. This court found that, because of the financial benefits to the attorneys, and the loss of tax revenue and integrity to the county, the attorneys would be required to pay restitution to Cook County in order to be reinstated to the practice of law. 
Fleischman
, 135 Ill. 2d at 497-99 (granting reinstatement upon condition of restitution); 
Alexander
, 128 Ill. 2d at 536-39 (denying reinstatement but discussing restitution issue).

We reiterate that each attorney disciplinary case is unique, and we must evaluate all of the relevant circumstances. Here, the Hearing Board found that Weck was not a credible witness, and that many of the circumstances in this case contradicted her testimony. The Hearing Board found that Weck was generally aware of the risks involved in investing in FRM. The Hearing Board found that respondent did not engage in any fraud or misrepresentation, and that respondent believed that FRM was a good investment. The parties do not challenge the Hearing Board’s findings. Restitution is not an appropriate sanction under these circumstances.

For the foregoing reasons, we approve the recommendation of the Review Board, and we approve in part and reject in part the recommendation of the Hearing Board. Respondent is therefore suspended from the practice of law for a period of six months.

Respondent suspended
.

JUSTICE MILLER, dissenting:

I disagree with the majority’s disposition of the present case. In my view, the respondent’s misconduct warrants a suspension of at least one year. In addition, I believe that the respondent should be ordered to pay restitution to the injured client.

The respondent does not contest the findings of misconduct made below. The Hearing Board found that the respondent breached his fiduciary duty to Nancy Weck, his client; that he represented her when the representation was materially limited by his responsibilities to another client or to a third person, or by his own interests, without making full disclosure of that to  Weck; that he represented multiple clients in a single matter without explaining to them the implications of his actions and the risks involved; that he entered into a business transaction with Weck without making full disclosure; that he made a statement of material fact or law that he should have known was false; and that he engaged in conduct that tends to defeat the administration of justice or brings the courts or legal profession into disrepute.

The majority opinion contains a detailed recitation of the circumstances surrounding the respondent’s misconduct, and there is no need for me to repeat that evidence here. It is sufficient to note that the respondent served as counsel for Fox River Minerals, Inc. (FRM), receiving a weekly retainer of $500 for his work. The respondent was the sole signatory on FRM’s “special account,” into which all receipts were deposited. The respondent would transfer funds from the special account into a separate payroll account as the money was needed. According to the testimony of one FRM employee, there was a scramble each week to raise enough money to cover FRM’s payroll, and the respondent’s role was “to deal with the continual money crisis” experienced by the company. It is clear that the respondent was intimately familiar with FRM’s precarious financial condition.

On this record, I must disagree with the majority’s conclusion that a six-month suspension is the appropriate sanction in this case. The evidence showed that the respondent encouraged the client to make her initial loan of $15,000 to FRM. The respondent broached the subject with Weck and told her that she would receive interest of $2,500 on the $15,000 loan within 60 days. The loan was to be secured by an assignment of 10% of the shares of FRM stock held by the company’s principal shareholder, David Remy. Only two weeks earlier, however, the respondent had attended a meeting at which another person, Joseph Thoesen, received a promissory note from FRM for $120,000 and a written pledge of all Remy’s FRM stock as collateral. The respondent assured Weck that the FRM company had great potential and that his wife planned to invest in the company. The respondent did not provide Weck with any specific information about FRM’s finances, however, apart from the vague statement that the company required money to meet its payroll and expenses. The respondent did not advise Weck of his conflicting interests in the matter or recommend that she obtain independent advice before making the loan.

The circumstances surrounding the making of the second and third loans or investments are in dispute. Weck testified that the respondent approached her about the additional loans, while the respondent testified that they were Weck’s idea. In any event, it is clear that the respondent still failed to inform Weck about his conflicting interests or recommend that she obtain independent advice. Apparently guided by the credo “In for a dime, in for a dollar,” the respondent allowed Weck to extend further loans to FRM, even as its condition deteriorated and the likelihood that she would ever recover the value of her initial loan grew dimmer. On September 28, 1992, Weck gave the respondent a check for $5,000, which he immediately transferred to FRM’s payroll account, then overdrawn. The respondent received a total of $1,000 from this sum in the form of weekly retainer payments. The respondent also urged her to convert her status from that of creditor to that of shareholder. This only increased the risk she was bearing, however, for in the event of an eventual bankruptcy, she would be further removed from recovering any portion of her funds. No shares were ever issued to represent her supposed equity interest in FRM.

On the occasion of the third loan, on October 23, 1992, Weck did not tap her own reserves for the amount of the loan but borrowed the sum–$20,000–from a bank. The respondent immediately deposited $7,500 of Weck’s money into FRM’s payroll account, which was again overdrawn. The respondent deposited the balance of the loan into another account, but that was exhausted within days, and was used primarily for payroll purposes. The respondent personally received $2,500 from Weck’s third loan of $20,000.

Weck’s funds helped keep the enterprise afloat for a time; in that way, at least temporarily, she supported the value of the respondent’s wife’s $16,000 investment in FRM. Moreover, the respondent further personally benefitted from the client’s loans on those occasions when his weekly retainer was drawn on those fresh funds. In this case, the respondent did more than simply give his client a bad stock tip. He urged her to extend an initial loan to the company, and he later allowed her to make further loans or investments, without ever revealing to her his own interest in the matter and the conflict under which he was laboring. Even at the time of the hearing below, the respondent still refused to recognize the conflict of interests that arose in these circumstances. On this record, I believe that a suspension of at least one year is appropriate. In addition, I believe that restitution in the amount of Weck’s loss is in order.

JUSTICE RATHJE, also dissenting:

I strongly disagree with the majority’s conclusion that a six-month suspension is the appropriate sanction in this case. Respondent’s conduct warrants at least a two-year suspension. Additionally, I would grant the Administrator’s request that we make restitution to Nancy Weck a condition of respondent’s reinstatement to the bar.

LENGTH OF SUSPENSION

Not much needs to be said in dissent, as the majority opinion reads like a dissent from its own conclusion. The majority begins its analysis by stating that respondent’s sanction should be consistent with that imposed upon other attorneys for similar misconduct. Slip op. at 9. Next, the majority identifies four cases (
Demuth
, 
Rosin
, 
Imming
, and 
Goldstein
) that are “instructive and relative to [its] determination of the proper sanction.” Slip op. at 9. The majority reviews those cases, noting that each one involved a suspension of either one or two years. Thus, one assumes that the only mystery at this point is whether respondent will be suspended for one or two years. Then, in a twist that would make O. Henry proud, the majority decides not to follow its own “instructive and relative” authority and instead imposes a six-month suspension.

The majority offers several reasons for distinguishing the above cases, none of which is persuasive. First, the majority notes that the Hearing Board failed to prove that respondent engaged in fraud or misrepresentation. There were similarly no findings of fraud or misrepresentation in 
Demuth
, 
Rosin
, or
 Imming
, yet Imming and Rosin were suspended for two years and Demuth was suspended for one year. In this part of its analysis, the majority also notes that respondent told Weck that, if she lost money, he would indemnify her out of any contingent fee he received as her attorney in an unrelated environmental contamination suit. Why the majority puts any stock in this statement, given everything else that respondent told Weck, is beyond me. Further, the record does not show that respondent returned any of Weck’s money, and respondent has specifically argued throughout these proceedings that he should 
not
 have to make restitution to Weck.

The majority’s next justification for its lenient sanction is that respondent himself did not borrow money from Weck. Although this is a factually accurate statement, it is entirely misleading. Respondent stood to gain personally from Weck’s investment in FRM, and he directly benefitted from it. Respondent’s wife invested $16,219.68 in the company, and respondent characterized this as a purchase of 10% of the company. Thus, respondent’s family was potentially facing a significant loss if FRM went under. Further, at least $3,500 of the money Weck loaned to FRM went directly into respondent’s pocket. In 
Rosin
, we stated that, “ ‘Where an attorney exposes a client to the risk of loss, jeopardizes the freedom or the pecuniary or privacy interests of a client, or otherwise abuses his or her relationship with a client, whether or not the attorney receives an intended advantage, the attorney has breached a duty, owed to a client, of safeguarding the public.’ ”
 Rosin
, 118 Ill. 2d at 388, quoting 
In re Saladino
, 71 Ill. 2d 263, 276 (1978).

The majority’s final reason for distinguishing the other cases is that respondent had “no prior disciplinary complaints against him” and had a “reputation for honesty and integrity.” Slip op. at 13. This sounds familiar. Goldstein had a “previously unblemished record” (
Goldstein
, 103 Ill. 2d at 132); 
Imming
 had a “previously unblemished record for 26 years” (
Imming
, 131 Ill. 2d at 261); Rosin had “no prior history of disciplinary action” (
Rosin
, 118 Ill. 2d at 387); and Demuth had “not been charged with any other misconduct” and had a “good reputation in the community for honesty and integrity” (
Demuth
, 126 Ill. 2d at 14). If these cases are distinguishable, one wonders what the majority would consider to be “on all fours.”

Respondent’s conduct in this case was absolutely reprehensible. He committed six serious breaches of the Illinois Rules of Professional Conduct and caused his client to lose $40,000. I fail to see how a six-month suspension comports with the majority’s stated desire to “impress upon others the seriousness of the misconduct at issue.” Slip op. at 9. The majority recognizes that this type of conduct normally warrants a suspension of one or two years and then inexplicably suspends respondent for six months.

Additionally, the majority forgets to mention that, at the time of the hearing, respondent still did not concede that he had done anything wrong. In 
Demuth
, we found it significant that the respondent did not fully understand his ethical obligations as an attorney. 
Demuth
, 126 Ill. 2d at 15. Similarly, in 
Imming
 we based the discipline in part on the fact that the respondent did not appreciate the importance of his ethical obligations. 
Imming
, 131 Ill. 2d at 261. Here, respondent still maintained at the time of the hearing that there was no conflict of interest in this case. Further, respondent’s petition to this court was based on his assertion that his conduct warrants only a censure. Respondent, like Imming and Demuth, deserves a suspension lengthy enough to impress upon him the seriousness of his misconduct.

RESTITUTION

Easily the most regrettable part of the majority opinion is its analysis of whether respondent should be ordered to make restitution to Weck. Here, the majority merely copies the Hearing Board’s analysis, almost verbatim, without pausing to consider whether the Hearing Board’s reasoning is sound or supported by authority.

The majority contends that respondent need not make restitution because he did not commit fraud or make deliberate misrepresentations. This point is not well taken. The majority’s own “instructive and relative” authority shows that a finding of fraud or deliberate misrepresentation is not necessary for restitution to be made a condition of reinstatement. In 
Rosin
, there were no findings of fraud or misrepresentation, and the respondent was suspended for two years and until further order of the court. The suspension would be for two years if the respondent made full restitution, with interest, to his client in the amount of her lost investment. 
Rosin
, 118 Ill. 2d at 388-89.

Whether the attorney commits fraud or misrepresentation is not the proper inquiry. Rather, restitution is appropriate when there is an improper benefit to the disbarred attorney or a loss to some victim. 
In re Fleischman
, 135 Ill. 2d 488, 497-98 (1990); 
In re Alexander
, 128 Ill. 2d 524, 536 (1989). Restitution is a condition of reinstatement except in those rare instances where repayment to the victims is conclusively established to be impossible. 
Alexander
, 128 Ill. 2d at 536.

The majority’s only other reason for denying restitution is that respondent explained some of the risks involved with FRM and that Weck had more business acumen than she claimed. I searched the Rules of Professional Conduct in vain for the provision that says that an attorney owes a fiduciary duty only to those clients who are lacking in business acumen. Even assuming that Weck had the business acumen of Bill Gates, what does that matter if respondent did not disclose his conflict of interest and gave her false information about what she was receiving in collateral? Respondent continually assured Weck of the long-term potential of the company and induced her to invest more money to protect her previous investments. He did all of this without disclosing his unquestionable conflict of interest and while giving Weck only illusory promises of security for her investments.

This is not a case about poor investment advice, as the Review Board suggested. Rather, this is a case about breaching fiduciary duties; representing multiple clients in a single matter without an explanation to each client of the risks involved; entering into a business transaction with a client without full disclosure; making statements of material fact that the attorney should have known were false; engaging in conduct that brings the legal profession into disrepute; and representing a client, without full disclosure, when the attorney’s representation is materially limited by the attorney’s responsibilities to another client and by respondent’s own interests. The sad fact of the matter is that Nancy Weck lost $40,000 for no reason other than that respondent was her attorney. I would require respondent to repay this money as a condition of his reinstatement to the bar.

CONCLUSION

The six-month suspension imposed by the majority is too lenient, both on the facts of this case and in comparison to other cases involving similar misconduct. For all of the reasons stated above, and for those stated in the majority opinion, I would suspend respondent for two years and until further order of the court. This suspension would terminate at the end of two years only if respondent had made restitution to Nancy Weck in the amount of $40,000.