(No. 68867.—

*In re* MARSHALL ALAN FLEISCHMAN, Petitioner.

*Opinion filed March 29, 1990.*

490

WARD, CLARK and STAMOS, JJ., took no part.

Scott Renfroe, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Sidney Z. Karasik, of Chicago, for petitioner.

JUSTICE CALVO delivered the opinion of the court:

Petitioner, Marshall Alan Fleischman, was disbarred on consent (107 Ill. 2d R. 762) effective January 1, 1985. On January 25, 1988, petitioner filed for reinstatement to the roll of attorneys. Following an evidentiary hearing, a panel of the Hearing Board of the Attorney Registration and Disciplinary Commission (Commission) recommended unconditional reinstatement. The Review Board concurred. The matter is before us on the Administrator's exceptions to the report and recommendation of the Review Board.

Testimony adduced before the Hearing Board indicates that petitioner was admitted to the bar of Illinois in December of 1960. From 1961 to 1966, petitioner served as assistant corporation counsel of the City of Chicago and as assistant State's Attorney of Cook County. From 1966 through 1984, petitioner engaged in the general practice of law with an emphasis on contestation of real estate tax assessments. As a result of charges brought against petitioner by the Administrator, a panel of the Hearing Board recommended, in April 1984, to disbar petitioner. In November of 1984, while the Hearing Board's recommendation was pending before the Review Board, petitioner moved to have his name stricken from the roll of attorneys.

The Administrator's original disciplinary complaint alleged eight instances of misconduct, in the years 1978

through 1981, in which petitioner gave money to Robert Hosty or Stephen Gorny, both of whom were officials of the board of tax appeals of Cook County (Board). The complaint also charged petitioner with making false statements to agents of the Federal government.

The payments to Hosty and Gorny were made in cash, using small bills, and were usually accompanied by petitioner's expressions of appreciation for assistance rendered, or to be rendered, in matters which petitioner brought to the Board for review. The payments totalled $5,300. In several instances, "no change" notations on the files were crossed out and reductions were allowed. Prior to the first of these payments, petitioner had obtained reductions in assessments on matters before the Board in 50% to 60% of the cases he filed. After petitioner began making the payments, his rate of success on most cases rose to 80% to 90%. With respect to cases in which petitioner represented "the Berger group," a real estate conglomerate, there was an increased success rate, but not as pronounced as in other cases. Petitioner claimed his increased success rate resulted in only insignificant increases in his net income.

Petitioner adamantly maintained throughout all the proceedings before the Commission and this court that the payments he made to Hosty and Gorny were not for the purpose of influencing their decisions, but rather for the sole purpose of inducing them to read the files of petitioner's tax appeals. Petitioner said he was convinced the Board was not reading the files. He testified he paid the money, out of his own funds, so his clients could get fair hearings. Under questioning by counsel for the Administrator, petitioner admitted giving the following testimony in Gorny's Federal trial on mail fraud, racketeering and obstruction charges:

"I was hopeful that in cases that were—that could go either way, that he [Gorny] might possibly read the file and

give my clients the benefit of the documentation that was in the file.

* * *

All I was asking for was to read the file. And again if there were any close cases, if possibly he would interpret the documentation in favor of the client."

Regardless of his motive, petitioner unequivocally acknowledged what he did was "a hundred percent wrong."

Evidence of record indicates the caseload of the Board was staggering, and the procedures for handling cases chaotic, during the period in question. The volume of cases increased from about 45,000 in 1976 to approximately 70,000 in 1981. On any one hearing date, literally thousands of files were to be presented. Typically, a hearing would last 10 seconds and, on many occasions, the stacks of files were so high that an attorney looking at the bench could not see the commissioners.

Petitioner testified that, despite this atmosphere of procedural confusion, his preparation of his case files remained meticulous. He did not pursue cases which he felt did not warrant a tax reduction. The Administrator concedes there is no direct evidence petitioner procured unjustified reductions of assessed valuation.

Petitioner stopped making payments in March of 1981, in part, he testified, as "a matter of conscience" and, in part, because he became aware of an investigation concerning activities surrounding the Board. In May or June of 1981, FBI agents contacted petitioner and asked him to provide information regarding other attorneys who were targets of the investigation. After consulting with his attorney, petitioner and his attorney met with a Federal prosecutor and petitioner denied making payments to anyone outside of some gratuities or gifts at Christmas. During a second meeting, wherein petitioner was granted use immunity, petitioner again denied

making any payments. Later that evening, petitioner decided to tell the truth and asked his attorney to arrange another meeting so he could recant his previous denials. Petitioner was contemporaneously advised by his attorney, in substance, he would be indicted if he did not change his story. Petitioner thereafter recanted his previous statements and cooperated with the government, appearing in three trials as a government witness.

Before the Hearing Board, petitioner testified, not only about the improper payments herein at issue, but also about three or four $20 or $25 payments he had made to assistant State's Attorneys earlier in his career in order to obtain pretrial conferences on an expedited schedule. Although he was never charged with wrongdoing on account of those payments, he recognized they, and the payments to Gorny and Hosty, were wrong. In his testimony, petitioner expressed remorse, contrition, and his determination to henceforth conduct himself in a disciplined and upright manner.

Petitioner testified that, after his disbarment, he was employed as a trader at the Chicago Mercantile Exchange, as an automobile salesman, and as a seller of surplus goods for a manufacturer's close-out operation. Ralph Gatto, David Rubin and Ronald Berger, petitioner's employers, testified, or in the case of Rubin would have testified, that they were generally aware of the improprieties petitioner had engaged in, petitioner had expressed sorrow for what he had done and recognition of the wrong, he had applied himself rigorously and energetically, and he otherwise conducted himself well while in their employ. Berger, a friend and business associate in the close-out operation, testified he considered petitioner trustworthy and petitioner had a good reputation for truth and veracity.

It was stipulated Joy Marshall, manager of the ARK Thrift Shop from January 1981 to June 1988, would

have testified that ARK, a not-for-profit corporation, is a community-based free social, legal, medical and dental service agency for indigent persons. Petitioner worked for ARK as a volunteer beginning in November of 1985 through the date of his reinstatement hearing, engaged in activities generally performed by clerks. In addition, petitioner helped ARK through his active solicitation of donations from relatives, friends and acquaintances. Marshall considered petitioner to be trustworthy and honest. Petitioner testified he had volunteered 492 hours at ARK.

In addition to the foregoing witnesses, petitioner presented a formidable array of character witnesses, including: Judge Pasquale Sorrentino; former judge, now private practitioner, Saul Epton; Richard Daley, a social acquaintance and business associate of petitioner; Michael Holt, a physician specializing in psychiatry, and Joel Wineberg, a publisher, both longtime friends of petitioner; Barbara Norkett, a social acquaintance; John Norris, a tax appeal practitioner and former clerk to petitioner; and Sherwin Siegel, a real estate appraiser and consultant who had assisted petitioner in the preparation of his cases. Petitioner had explained to most of the witnesses how he had paid money to the commissioners of the Board in an effort to encourage the commissioners to examine the files he presented with a view toward a proper presentation of the appeal. Collectively, petitioner's witnesses testified that petitioner had expressed remorse over his misconduct and acknowledged the seriousness of his mistake, he had conducted himself honorably and with dignity after his disbarment, and the improprieties committed by petitioner represented aberrational behavior which they believed was unlikely to recur. Despite his mistake, petitioner was still held in high regard by these witnesses and by mutual friends. Norris, Siegel and Daley also testified regarding petitioner's se-

lectivity in the cases he took and his meticulous preparation in those causes he did accept.

Petitioner testified concerning his efforts to keep abreast of changes in the law during his disbarment. According to petitioner, he read advance sheets, studied the Code of Professional Responsibility (107 Ill. 2d R. 1–101 *et seq.*), and discussed law with his sons, while they were in law school, his father, Judge Philip Fleischman, and his brother-in-law, who was an assistant State's Attorney of Cook County during most of the period of petitioner's disbarment. In addition, petitioner engaged in legal discussions, pertaining to real estate assessment, with one of his former law partners.

Having heard the foregoing testimony, the Hearing Board concluded petitioner had proved by clear and convincing evidence that he is rehabilitated, that he is presently of good character, and that he has an adequate knowledge of the law. The Hearing Board recommended unconditional reinstatement and the Review Board concurred.

A petitioner seeking reinstatement to the practice of law has the burden of proving by clear and convincing evidence he should be reinstated. (*In re Alexander* (1989), 128 Ill. 2d 524, 533; *In re Carnow* (1986), 114 Ill. 2d 461, 469.) Each petition for reinstatement is unique and requires an independent evaluation of its relevant circumstances (*Alexander*, 128 Ill. 2d at 539; *In re Holz* (1988), 125 Ill. 2d 546, 558) considering the following factors set forth in Rule 767(f):

> "(1) the nature of the misconduct for which the petitioner was disciplined;
>
> (2) the maturity and experience of the petitioner at the time discipline was imposed;
>
> (3) whether the petitioner recognizes the nature and seriousness of the misconduct;

(4) when applicable, whether petitioner has made restitution;

(5) the petitioner's conduct since discipline was imposed; and

(6) the petitioner's candor and forthrightness in presenting evidence in support of the petition." (107 Ill. 2d Rules 767(f)(1) through (f)(6).)

Rehabilitation is the most important factor in reinstatement proceedings. (*In re Wigoda* (1979), 77 Ill. 2d 154.) In considering a petition for reinstatement, the focus is on petitioner's rehabilitation and character. (*In re Polito* (1989), 132 Ill. 2d 294, 300.) Because the Hearing Board is able to observe the demeanor of witnesses, judge their credibility and evaluate conflicting testimony, we accord deference to the Hearing Board's findings of fact (*In re Imming* (1989), 131 Ill. 2d 239, 251; *In re Anglin* (1988), 122 Ill. 2d 531, 538) insofar as they are supported by the record.

With respect to the first factor listed in Rule 767(f), we note we have repeatedly condemned bribery of public officials as " 'a serious offense that undermines the integrity of our system of government.' " (*Alexander*, 128 Ill. 2d at 535, quoting *In re Gottlieb* (1985), 109 Ill. 2d 267, 270.) Even assuming petitioner paid Gorny and Hosty *only* to encourage them to read the files of his appeals as they were legally required to do, petitioner's actions are no less bribery, because petitioner intended "to influence the performance of [an] act related to the employment or function of [a] public officer." (See Ill. Rev. Stat. 1987, ch. 38, par. 33—1 (bribery).) Although there is no evidence here of *fraudulent* reductions, as was the case in *Alexander*, petitioner's misconduct was nonetheless serious. The seriousness of past misconduct is unquestionably an important consideration which cannot be minimized by subsequent exemplary conduct. *Alexander*, 128 Ill. 2d at 534-35.

The second factor under Rule 767(f), the maturity and experience of the petitioner, also weighs heavily against petitioner. Petitioner had been an active practitioner for about 20 years at the time of the misconduct. He was, at that time, around 40 years old.

With respect to factors three and five, it appears the Hearing Board found, from petitioner's testimony and testimony of his witnesses, that petitioner *did* recognize the nature and seriousness of his misconduct. The Hearing Board had an extensive opportunity to view petitioner's demeanor while testifying and was therefore in a better position than are we to judge the depth of petitioner's contrition and remorse. As for petitioner's conduct since disbarment, petitioner apparently has conducted himself in an exemplary fashion, applying himself energetically to jobs others might consider below his former station in life, and contributing his time to charitable activities.

The Hearing Board found that petitioner was candid and forthright in his presentation of evidence before the Board. This is another factor which the Board is best able to apply, having viewed the petitioner while testifying. Although we are troubled somewhat by petitioner's inability to satisfactorily reconcile his Federal testimony in the prosecutions of Gorny and Hosty with his contention in reinstatement proceedings to the effect he only paid money to influence the commissioners to read the files, petitioner unequivocally acknowledged that his conduct was "a hundred percent wrong" and his testimony convinced the Board that petitioner *is* rehabilitated. We concur that reinstatement is appropriate.

Although petitioner has not as yet made restitution, he has expressed his readiness to do so. We must therefore determine whether restitution is warranted and, if it is, the amount due. Before restitution can be required, there must be some basis for restitution—usually either

an improper benefit to the disbarred attorney or a loss to some victim. (*Alexander*, 128 Ill. 2d at 536; *Carnow*, 114 Ill. 2d at 470.) While petitioner did not procure *fraudulent* reductions, as was the case in *Alexander*, petitioner nonetheless received a benefit which, according to him, honest practitioners before the Board were not receiving, *i.e.*, careful scrutiny of the merits of their cases. Although, as a result of petitioner's improper payments, the county may not have lost revenue to which it was entitled, petitioner's payments had the effect of fueling and perpetuating a corrupt system which rendered justice only to those willing to pay for it. It may well be other meritorious files were not read because petitioner's were. We believe petitioner received an improper benefit by reason of his misconduct notwithstanding that he was legally entitled to have his files read.

There remain the questions of how much restitution is owing and to whom it should be paid. The answer to the latter question is Cook County. Petitioner's conduct helped subvert Cook County's board of tax appeals. The loss of integrity in the system is beyond price; however, restitution to Cook County may in some small way help ensure that the tax appeal system is hereafter adequately funded and staffed. As for the amount owing, we believe the amount petitioner was willing to pay to receive favored treatment is, in the absence of more specific evidence, correlative to the benefit he received. If there were a sum certain that petitioner had obtained as a result of his conduct, we would order restitution in that amount; however, contrary to the Administrator's position, there is insufficient evidence to support the Administrator's claim that petitioner's 30% increase in his success rate before the Board translated into $10,000 a year in fees. Thus, petitioner, as a condition of reinstatement, must pay $5,300 restitution to Cook County.

Accordingly, it is ordered that petitioner be reinstated to the practice of law upon payment of $5,300 to the treasurer of Cook County.

*Petitioner reinstated upon condition.*

JUSTICES WARD, CLARK and STAMOS took no part in the consideration or decision of this case.