Docket No. 101317.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

*In re* JOSEPH ANTHONY MARTINEZ-FRATICELLI,
Attorney, Petitioner.

*Opinion filed May 18, 2006.*

JUSTICE FREEMAN delivered the judgment of the court,
with opinion.

Chief Justice Thomas and Justices McMorrow, Fitzgerald,
Kilbride, Garman, and Karmeier concurred in the judgment and
opinion.

**OPINION**

Petitioner, Joseph Anthony Martinez-Fraticelli, was disbarred on consent (145 Ill. 2d R. 762) effective May 27, 1998. On June 20, 2003, petitioner filed a petition seeking reinstatement to the roll of attorneys. 134 Ill. 2d R. 767. Both the Hearing Board and the Review Board of the Attorney Registration and Disciplinary Commission recommended that petitioner be reinstated to the practice of law. We allowed the Administrator leave to file exceptions to the report and recommendation of the Review Board. 166 Ill. 2d R. 753. For the reasons that follow, we determine that petitioner should be reinstated to the roll of attorneys.

## BACKGROUND

In the reinstatement proceedings, petitioner testified on his own behalf and offered the testimony of several character witnesses. Federal Bureau of Investigations Special Agent Kenneth S. Samuel was the sole witness on behalf of the Administrator. A summary of the evidence adduced at the hearing follows.

Petitioner testified that he was born in Puerto Rico in 1945, and moved to Chicago with his family in 1953. He began working at a clothing store at the age of 12, and worked continuously through his high school and college years. He joined the Illinois Army National Guard in 1969, served four months of active duty, and was honorably discharged in 1975.

Petitioner's job in the clothing store was no longer available upon his return from active duty. Petitioner testified that with the help of his precinct captain and ward committeeman, he was able to secure a position as a minute clerk in the criminal division of the circuit court of Cook County. Three years later, again with the help of the precinct organization, he was able to secure employment with the Cook County board of tax appeals. He accepted and reviewed tax assessment files submitted to the board of tax appeals to ensure that each file contained the documentation needed to support the request for tax relief. He was authorized to make recommendations on single-family residences with assessment values of less than $2,000.

Petitioner testified that while working at the board of tax appeals, he attended classes at night at DePaul University

College of Law, graduating in 1976. Starting in 1978, he was appointed to the Cook County Board of Corrections, an oversight board addressing the grievances or complaints of persons incarcerated at the county jail. Board of Corrections members were not salaried but received a *per diem* allowance for attendance at meetings. In 1979, he was admitted to the practice of law. Also, at some point in the 1970s, he became the assistant precinct captain of the 31st ward's 28th precinct. When the precinct captain died in 1980, he succeeded him to the post.

Mel Klafter was an attorney practicing law before the board of tax appeals. Petitioner testified that in 1981 Klafter offered him a position with the law firm of Klafter & Burke. He was to review real estate tax appeal files for the law firm to ensure that the files contained the necessary supporting documentation. He accepted the offer, leaving the board of tax appeals to work for the law firm. Although petitioner worked exclusively for the law firm, petitioner testified, the law firm gave him a 1099 form as an independent contractor at the end of the year. The law firm did not provide any employment benefits to him.

In December 1981, Chicago Mayor Jane Byrne asked petitioner to fill the unexpired term of 31st ward alderman Chester Kuta. Petitioner testified that he did not seek the appointment and did not know why the mayor had selected him for the position. He accepted the part-time position, which paid approximately $20,000 a year and provided him with health and pension benefits, while continuing his work at Klafter & Burke. The appointment lasted 14 months. At the end of the term, he was not asked to run for election, and did not do so.

Petitioner testified that in 1985 he asked the law firm to provide him with health insurance benefits, and the named partners, Klafter and Edward Burke, told him that they would look into it. Shortly thereafter, Burke, then chairman of the Chicago city council's committee on finance (Finance Committee), told him to fill out an application for part-time employment as a legislative aide to the committee. He completed a personal data form, and a Department of Personnel screening questionnaire. The forms did not indicate whether the legislative aide position was part-time or full-time.

However, he disclosed on the questionnaire that he was a self-employed attorney. Petitioner testified that, the following day, Burke told him that he had been hired as a legislative aide to the Finance Committee. He was to be "on call" for the committee, with work coming from the committee to the law office. Burke gave him several bar journals and advance sheets to review and determine what cases impacted the Finance Committee or the city. Petitioner stated that he did not have a supervisor at city hall. Indeed, upon inquiry at city hall, he was told that there was no office, chair or desk where he could work.

Petitioner worked for the Finance Committee from August 1, 1985, through May 15, 1987, receiving approximately $18,177 in wage payments and $6,642 in health insurance coverage and benefits. Petitioner testified that either he would pick up his check at city hall or the check would be delivered to him at the law office by Burke's secretary. Beyond the original assignment given to him by Burke, he did not receive any work assignments from the committee. Petitioner testified that on several occasions he requested additional assignments from Burke. However, Burke told him that he was "on call" and would receive assignments as needed.

On May 16, 1987, petitioner was appointed as a legislative aide to the Chicago city council's Committee on Land Acquisition, Disposition, and Leasing (Land Acquisition Committee). Petitioner stated that he did not ask to be transferred and did not interview for the position with the Land Acquisition Committee. Rather, Burke informed him of the transfer, told him that he would be "on call" for the committee, and told him that he would receive committee work at the law office as needed. Petitioner testified that he understood the position with the Land Acquisition Committee was part-time, and anticipated that he would receive work from the committee.

Petitioner was employed by the Land Acquisition Committee until March 31, 1988. Petitioner testified that periodically he inquired of Burke about work for the committee but did not receive any assignments. He did not ask the chair of the Land Acquisition Committee for work. Indeed, he did not have any direct contact with the chair of the committee.

Petitioner testified that he was told at city hall there was no office, chair or desk where he could work. During his tenure with the committee, petitioner received approximately $5,171 in wage payments and $4,405 for health insurance coverage and benefits.

Petitioner testified that, at Burke's direction, he applied for a position as a clerk with the Chicago city council's Committee on Traffic Control and Safety (Traffic Committee). As part of the application process, he disclosed that he worked as a self-employed attorney. He did not interview for the position with the Traffic Committee. Rather, Burke informed him that he had been hired by the committee. He did not have a place to work at the committee's office and did not receive any assignments from the committee. Petitioner testified that he asked Burke for work assignments periodically, but did not receive any. Petitioner stated that either he picked up his checks at the committee's office or the checks were delivered to him at the law firm by Burke's secretary.

Petitioner testified that, starting in December 1991, he was asked to fill out time sheets for the Traffic Committee. For approximately four months, he signed in almost daily at the committee's office and received his checks on payday. Petitioner believes that he was also required to sign out. Petitioner testified that, at the time, he believed that by signing the time sheets he was showing that he was available to work. In retrospect, he realized the time sheets created the false impression that he was actually working at the committee's office every day.

Petitioner resigned from the Traffic Committee on April 15, 1992, having received approximately $29,795 in wage payments and $26,305 for health insurance coverage and benefits. He did so as a matter of conscience, knowing that it was wrong to continue his employment when he was not performing any work. Petitioner testified that he had been troubled by his lack of work assignments on all three committees and wanted to return the money that he had received. However, he did not know how to return the money without attracting attention to himself. At the time of his

resignation, he had heard rumors of investigations of ghost payrolling, but the rumors did not influence his decision.

Petitioner continued his work with Klafter & Burke. Petitioner testified that, after Klafter's death in 1987, petitioner appeared before the board of tax appeals on behalf of clients. Starting in January 1992, the law firm provided health insurance benefits to him. His earnings at the firm increased over the years, such that he earned $134,191 in 1995.

On April 17, 1995, an agent of the Federal Bureau of Investigations (FBI) left a business card at petitioner's home, with a request that petitioner call the FBI. The next day, petitioner obtained a certified check in the amount of $45,000, what he calculated his wages from the city committees to have been over the years. He took the check to the city treasurer's office but the office refused to accept it. Petitioner then mailed the check to Mayor Richard M. Daley with a note of explanation.

Petitioner met with the FBI on April 19, 1995, without counsel. Petitioner testified that he panicked when the FBI agents told him that he was the subject of the ghost-payrolling investigation. He lied to the agents, telling them that Alderman Anthony Laurino had hired him as a consultant to the Traffic Committee. His job was to review traffic-related cases in a law journal and report to Laurino. As a consultant, he had no set hours that he was required to work for the committee. Approximately four to six months prior to leaving the committee in 1992, Laurino asked him to sign in at the committee's office on a daily basis. He signed in at approximately 9 a.m., stayed a short while, and left for his law office.

Petitioner met with FBI agents a few weeks later, again without counsel. At the meeting, petitioner informed the FBI agents that he had lied to them at the first meeting. He apologized to the agents and answered their questions truthfully. From that point on, petitioner cooperated with the FBI, meeting with agents on four other occasions and answering their questions fully.

The subsequent interviews were done pursuant to an October 1995 proffer letter, an agreement between the United

States Attorney's office and petitioner that information so obtained would not be used against petitioner. FBI Special Agent Samuel testified that the information petitioner gave pursuant to the proffer was consistent with, but more extensive than, the information in petitioner's subsequent plea agreement. The government used the information petitioner provided pursuant to the proffer in indicting Laurino.

As part of the reinstatement proceedings, petitioner gave a consent to the United States Attorney's office for the release of the information protected by the proffer to the Hearing Board. Apparently because of an ongoing investigation, the United States Attorney's office released a redacted copy of the proffer protected information to the Hearing Board. The Hearing Board admitted the document into evidence and placed it under seal.

Petitioner testified that he appeared before a grand jury, admitted that he had lied to the FBI agents at their first meeting, and testified truthfully regarding his employment with the city committees. Also, from his meetings with the FBI, petitioner learned that the positions he held on the committees were considered full-time positions, and obtained an approximation of the wage payments and the health insurance coverage and benefits that he had received from the city. On October 6, 1995, petitioner sent a certified check to Mayor Daley in the amount of $25,000. Petitioner completed restitution on October 1, 1996, sending a final check to Mayor Daley in the amount of $21,000. In all, petitioner refunded to the city $91,000, an amount in excess of the wages and health insurance benefits that he received from the city. Petitioner did not receive any special consideration for paying back the funds, actually refunding the money against the advice of counsel.[1]

---

[1]During the reinstatement proceedings, petitioner obtained information from Blue Cross Blue Shield regarding a visit he had made to a hospital emergency room in 1988. Petitioner attempted to reimburse Blue Cross Blue Shield the $324 the insurance carrier had paid for the visit. Blue Cross Blue Shield refused the payment, however, because the City is self-insured and had actually covered the cost of the visit. The difference between the $91,000 petitioner refunded the city and the total of the wages and benefits

The United States Attorney filed an information against petitioner on January 23, 1997, charging him with theft of federal program funds given to the City of Chicago in that he received wage payments and health insurance coverage and benefits while employed by the Traffic Committee without performing any work for the committee. Also on January 23, 1997, petitioner pled guilty to theft of money from programs receiving federal funds in connection with his employment with the Traffic Committee. In particular, petitioner admitted that he knowingly and intentionally stole federal funds by accepting wage payments and health insurance coverage and benefits for work as a full-time employee of the Traffic Committee when in fact he performed no work for the committee. Petitioner also admitted that, starting in December 1991, he signed time sheets at the Traffic Committee's office, knowing that he was creating the false appearance that he was "on call" for the committee. During this time period, petitioner neither expected to perform nor did he perform, any work for the committee.

For purposes of computing his sentence under the United States Sentencing Guidelines, petitioner stipulated to additional wrongdoing in connection with his employment with the Finance Committee and the Land Acquisition Committee. Petitioner admitted that he stole federal funds by receiving wage payments and health insurance coverage and benefits for work as an employee of the Finance Committee when, in fact, he performed only several hours of work for the Finance Committee. Further, petitioner admitted that he stole federal funds by receiving wage payments and health insurance coverage and benefits for work as an employee of the Land Acquisition Committee when, in fact, he performed no work for the Land Acquisition Committee. Lastly, petitioner admitted that he was placed on the payroll of all three committees in order to receive health insurance.

---

the city paid petitioner was sufficient to cover the money paid for the emergency room visit.

In the plea agreement, petitioner agreed to fully and truthfully cooperate with the government in any matter in which he is called upon to cooperate. Further, defendant agreed to provide complete and truthful information in any investigation and pretrial preparation, and complete and truthful testimony before any federal grand jury and in any court proceeding. In turn, the United States Attorney acknowledged petitioner had demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. The government promised it would make known to the sentencing judge the extent of petitioner's cooperation, and pledged to move the court to depart downward from the applicable sentencing guidelines range.

The district court granted the government's motion for a downward adjustment in the sentencing guidelines because of petitioner's cooperation. The court imposed a 10-month sentence upon petitioner, with petitioner to serve five months in the custody of the Attorney General, and five months in home confinement. In addition, the court sentenced petitioner to supervised release for two years, ordered him to pay an assessment of $50 as required by federal law, and fined him $15,000. Lastly, the court ordered petitioner to perform 100 hours of community service.

Petitioner served his sentence at Oxford Prison Camp in Wisconsin, and complied with all other terms of the sentencing order. He performed the required community service in three months, working as an assistant in the outpatient care department of a hospital near his home. Upon completion of his term of community service, petitioner continued to volunteer at the hospital an additional three to four months.

Petitioner testified that prior to his conviction he had volunteered with the parking team and the welcome desk at the Moody Church, where he also attended services. With the news of the investigation, he decided to withdraw from any public ministry at the Moody Church so as not to bring disrepute to the church. Shortly after his release from prison, he returned to the Moody Church and once more volunteered in the church's ministries. In particular, he volunteered for 10 hours a week in the church's office, working with the assistant

to the senior pastor. In the fall of 1999, when a part-time position for a security and public relations person became available, the assistant to the senior pastor recommended that petitioner be hired. Petitioner accepted the offered employment, all the while continuing his volunteer activities at the church. Four months later, petitioner accepted full-time employment at the church as the coordinator of public safety and public relations, a position he continues to hold.

Staff members of the Moody Church testified that petitioner's position at the church is highly visible and requires a great deal of honesty and trustworthiness. According to the testimony, petitioner is seen by many as the face of the church, being present at public events the church holds, and being the first person that many visitors to the church will meet. Petitioner accepts offerings from church attendees who have missed the offering collection, is responsible for the cash boxes at ticketed events, and holds the parking stickers the church uses to subsidize parking for attendees. Petitioner has access to the church's petty cash safe which is used for individual offerings, Sunday school offerings, petty cash boxes from ticketed events and sales, miscellaneous checks, and the parking stickers. He holds a "G-master key" to the church, a key that provides access to most places in the church. Within the church community, petitioner has a reputation for honesty, trustworthiness, and reliability. He is viewed as person of great humility who is attentive to others and takes care of their needs. According to witnesses, petitioner is cooperative, has a "gentle spirit," and a "real servant's heart."

Petitioner and staff members of the Moody Church testified that petitioner continues to volunteer at the church. In particular, petitioner helps with transportation for short-term mission teams going overseas, coordinates efforts in obtaining goods and other donations to be shipped to refugee camps in Africa, and is a tutor with "Kids Club," the church's outreach ministry to underprivileged children living in Chicago public housing facilities. Petitioner is at the church six or seven days a week, regularly spending 10 hours a day on his formal duties and volunteer activities. Frequently, petitioner leaves the church between 10 p.m. and 11 p.m. Petitioner was also

involved in the church's capital campaign, heading up the team that made telephone calls to raise money for the campaign.

Petitioner has not kept his employment with the city council committees and ensuing conviction for ghost payrolling a secret from church leadership. In 1990, petitioner told Douglas Bastian, then Minister of Pastoral Care, that he worked at city hall to get health benefits and that he also had a job at a law firm. In his evidence deposition, Bastian stated that by late 1990 or early 1991 petitioner started expressing frustration about his employment at city hall. On several occasions, petitioner voiced concern over the fact that he was not receiving work, and stated that he was not earning the money that he was being paid. Petitioner also mentioned that he had been transferred because of his inquiries about work assignments. In a progression that took place over months, petitioner stated that he wanted to return the money to city hall, that he was going to return the money to city hall, and that he had made an unsuccessful attempt to return the money. Petitioner also told him that he wanted to return the insurance benefits.

Erwin Wesley Lutzer, senior pastor at the Moody Church, testified that petitioner told him he had received money from the city that he had not earned, and he intended to pay back the money to the city. Petitioner expressed contrition and regret over his employment with the city council committees and over his conviction for ghost payrolling. Lutzer emphasized that in all the years he has known petitioner, both before and after his incarceration, petitioner has never once complained that his conviction was unjust or inappropriate. Petitioner has accepted his punishment with a sense of humility and brokenness, with a realization that he had done wrong and deserved the punishment meted out to him. Lutzer expressed his belief that petitioner is a different person from the one who was involved in criminal activity in the 1980s. He is to be trusted with anything and has shown great faithfulness to the church community. Roy Schwarcz, a pastor and missionary on staff at the Moody Church from 1995 until 2002, also talked with petitioner about his conviction for ghost payrolling.

Petitioner was genuinely remorseful over his actions in accepting money for work that he did not do.

Petitioner and staff members of the Moody Church testified that, as part of the hiring process, petitioner discussed his conviction with church leadership. Petitioner revealed that he had been convicted for receiving money for work he did not do while employed by the city council committees. Petitioner talked about serving time in prison and refunding the money he owed to the city. Also, during the church's capital campaign in 2000, petitioner shared with a group of approximately 80 church leaders where he has been in life, and what his experience has been in his relationship with God and with other persons. Petitioner talked about his criminal activity and conviction, the grace of God in his life since his conviction, and the changes in his life. Petitioner realized what he had done was wrong, took full responsibility for his actions, and determined to live a life pleasing to God.

At the reinstatement hearing, petitioner readily admitted his guilt in accepting money for work that he did not perform. He recognized he had not earned the money that he was paid, he was wrong in accepting the money, and he should have resigned immediately when his requests for work did not lead to additional assignments. He testified that, to his shame, he fooled himself into believing that more work was forthcoming. Petitioner stated categorically that "it was wrong to be involved in anything that would defraud anybody as a result of my involvement in this. No question that I was in an activity that defrauded the taxpayers of the City of Chicago, and I disgraced them, and brought disgrace upon the legal profession, and I brought disgrace upon my family. I did wrong. I brought disgrace upon my God." Petitioner apologized for his criminal activities, explained that his life has changed substantially, and affirmed his desire to live a life that honors God and that is helpful to other people.

Petitioner also testified regarding his efforts to keep current with the law. Petitioner reviews advance sheets and has attended seminars, including a seminar on real estate tax and a seminar on legal ethics. Petitioner has also reviewed the

rules of evidence, the Code of Civil Procedure, and the supreme court rules.

As noted above, the Hearing Board recommended that petitioner be reinstated to the practice of law. The Administrator filed exceptions to the report and recommendation of the Hearing Board with the Review Board. The Review Board confirmed the recommendation of the Hearing Board that petitioner be reinstated to the practice of law. The Administrator sought and was granted leave to file exceptions to the report and recommendation of the Review Board. Additional facts relevant to the appeal will be discussed in the analysis portion of the opinion.

ANALYSIS

An attorney who has been disbarred on consent must wait three years after the date of the order allowing disbarment to file a petition seeking to be reinstated to the roll of attorneys admitted to practice law. 134 Ill. 2d R. 767(a). In the reinstatement proceedings, the petitioning attorney has the burden of proving by clear and convincing evidence that he should be reinstated to the practice of law. *In re Parker*, 149 Ill. 2d 222, 232 (1992); *In re Gottlieb*, 109 Ill. 2d 267, 269 (1985). The focus is on the petitioning attorney's rehabilitation and character (*In re Fleischman*, 135 Ill. 2d 488, 496 (1990); *In re Polito*, 132 Ill. 2d 294, 300 (1989); *In re Berkley*, 96 Ill. 2d 404, 411 (1983)), with rehabilitation being the most important consideration (*Fleischman*, 135 Ill. 2d at 496; *In re Wigoda*, 77 Ill. 2d 154 (1979)). Rehabilitation is a matter of the petitioner's return to a beneficial, constructive and trustworthy role. *In re Wigoda*, 77 Ill. 2d at 159.

The petition for reinstatement is referred initially to a panel of the Hearing Board to determine whether reinstatement should be granted. 134 Ill. 2d R. 767(f). The hearing panel must consider the following factors, and such other factors as the panel deems appropriate, in determining the petitioner's rehabilitation, present good character and current knowledge of the law:

"(1) the nature of the misconduct for which the petitioner was disciplined;

(2) the maturity and experience of the petitioner at the time discipline was imposed;

(3) whether the petitioner recognizes the nature and seriousness of the misconduct;

(4) when applicable, whether petitioner has made restitution;

(5) the petitioner's conduct since discipline was imposed; and

(6) the petitioner's candor and forthrightness in presenting evidence in support of the petition." 134 Ill. 2d R. 767(f).

Either the petitioner or the Administrator may file exceptions to the report of the Hearing Board with the Review Board. 166 Ill. 2d R. 753(d).

Reports or orders of the Review Board are reviewed upon leave granted by this court or upon the court's own motion. 166 Ill. 2d R. 753(e). In *Parker*, the court explained the objectives in evaluating a petition for reinstatement and the respective roles of the Hearing Board and the court:

"In evaluating a petition for reinstatement, this court must consider the 'impact that an attorney's conduct has, or will have, on the legal profession, the public and the administration of justice.' (*In re Kuta* (1981), 86 Ill. 2d 154, 157; *In re Zahn* (1980), 82 Ill. 2d 489, 493.) While this court strives for consistency in attorney discipline and reinstatement cases ([*In re Carnow*, 114 Ill. 2d 461, 472 (1986)]), we recognize that each case of attorney misconduct and each petition for reinstatement is unique and requires an independent evaluation of its relevant circumstances (*In re Holz* (1988), 125 Ill. 2d 546, 558; *In re Cheronis* (1986), 114 Ill. 2d 527, 535). We further note that this court alone decides whether or not the petition is granted, and thus the hearing panel can only make recommendations as to the disposition of the petition. (*In re Harris* (1982), 93 Ill. 2d 285, 291-92.) However, the hearing panel findings of fact are entitled

˘14˘

to virtually the same weight as the findings of any other trier of fact. *Harris*, 93 Ill. 2d at 292." *Parker*, 149 Ill. 2d at 232-33.

See also *In re Cohen*, 83 Ill. 2d 521, 525 (1981) ("the findings and recommendations of the Inquiry, Hearing and Review Boards are entitled to and receive our serious consideration. These boards, with the exception of the Review Board, see and hear the witnesses and play important roles in screening and hearing cases, making factual findings in contested matters and developing uniformity in our disciplinary system"). Lastly, we note that the hearing panel findings will not be disturbed on review unless they are against the manifest weight of the evidence. *In re Rinella*, 175 Ill. 2d 504, 517 (1997).

In the present case, the Administrator takes exception to petitioner's reinstatement, arguing that the Hearing Board and the Review Board failed to give adequate consideration to factors weighing against reinstatement. We review the findings as to each factor listed in Rule 767(f) in turn.

The first factor under Rule 767(f) is the nature of the misconduct for which the petitioning attorney was disciplined. The Hearing Board recognized the serious nature of petitioner's misconduct:

> "By accepting money to which he was not entitled, Petitioner not only defrauded the citizens of Chicago but engaged in a federal crime. The fact that the illegal conduct continued for nearly seven years adds to the severity of the misconduct as does the fact that, during his final months with the Traffic Committee, Petitioner signed his name each morning to a daily log-in sheet at the Committee office. Placing his signature on those sheets signified his physical presence in the Committee office when, in reality, he spent each day at his law firm."

However, the Hearing Board determined that petitioner's misconduct was not sufficient reason to deny petitioner reinstatement. Citing *Fleischman*, 135 Ill. 2d 488, *In re Kuta*, 86 Ill. 2d 154 (1981), *In re Cohen*, 83 Ill. 2d 521 (1981), *In re*

*Wonais*, 78 Ill. 2d 121 (1979), and *Wigoda*, 77 Ill. 2d 154, the Hearing Board noted that attorneys who had engaged in bribery, conduct that strikes at the core of our legal system and entails a specific intent to do wrong, have been reinstated to the practice of law upon a proper showing of rehabilitation. Observing further that petitioner neither initiated the ghost-payrolling arrangement nor requested the committee assignments, the Hearing Board concluded that "misconduct involving bribery is more egregious than the misconduct engaged in by Petitioner."

The Administrator does not contend that petitioner's "misconduct, as serious as it is, should of itself forever preclude reinstatement." However, the Administrator asserts that the "egregious nature" of the misconduct "can hardly be overstated." Further, the Administrator contends that petitioner's misconduct is closer in nature and severity to the misconduct involved in *In re Alexander*, 128 Ill. 2d 524 (1989), where the court denied the petition for reinstatement, than the misconduct involved in *Fleischman*, 135 Ill. 2d 488, where the court granted the petition for reinstatement.

In *Alexander*, the petitioner was convicted of 15 counts of mail fraud and one count of racketeering in connection with his payment of bribes, over a three-year period, to deputy commissioners and other employees of the board of appeals of Cook County. The board of appeals reviewed real estate assessments made by the Cook County assessor's office for the purpose of determining the real estate tax owed on property. The petitioner practiced law with the firm of Welfeld & Chaimson, where his duties mainly involved filing and litigating real estate tax objections, and appearing before the board of appeals. The firm's fees were based on the amount of taxes the property owners saved due to lowered real estate assessments. The law firm filed over 260 cases for real estate assessment reductions and obtained fraudulent assessment reductions in excess of $8.5 million. The firm received $240,000 in legal fees in connection with its real estate tax work.

Following his conviction, the petitioner was disbarred on consent. Three years later, the petitioner filed a petition for

reinstatement, and the court denied the petition. In doing so, the court commented on the petitioner's maturity at the time discipline was imposed. The court also determined that the petitioner had a duty to pay restitution and had failed to do so. Lastly, the court considered the seriousness of the petitioner's misconduct:

> " '[T]he bribery of elected officials is a serious offense that undermines the integrity of our system of government.' (*In re Gottlieb* (1985), 109 Ill. 2d 267, 270.) While the officials to whom bribes were paid by petitioner may not have been elected officials, they were public officials under the direct control of two elected commissioners ***. [Citation.] Bribing employees of a government agency, like the Board, implicates the same concerns as bribing a duly elected official. Moreover, '[f]or a lawyer to participate in such an offense is particularly reprehensible.' *In re Gottlieb*, 109 Ill. 2d at 270." *Alexander*, 128 Ill. 2d at 535.

The court concluded:

> "In evaluating a petition for reinstatement, this court must consider the 'impact that an attorney's conduct has, or will have, on the legal profession, the public and the administration of justice.' (*In re Kuta* (1981), 86 Ill. 2d 154, 157; *In re Zahn* (1980), 82 Ill. 2d 489, 493.) To allow petitioner's petition for reinstatement at this time would seriously devalue the importance of restoring the public and the legal profession's confidence in the fair administration of justice." *Alexander*, 128 Ill. 2d at 539.

We disagree with the Administrator's assertion that petitioner's misconduct is of the same nature and severity as the misconduct involved in *Alexander*. Petitioner defrauded the citizens of the City of Chicago in that he accepted wage payments and health insurance coverage and benefits from the city council committees for work that he did not perform. His participation in the ghost-payrolling arrangement, however, was not connected to his work as an attorney and did not impact clients of the law firm. In contrast, the petitioner in *Alexander* represented clients before the board of appeals, and paid bribes to the very officials and employees of the board of

appeals charged with reviewing the real estate assessments made by the Cook County assessor's office. The petitioner's misconduct in *Alexander* was directly tied to the petitioner's practice of law and called into question the fairness, integrity and decisionmaking of a government agency. Further, we note the magnitude of the fraud perpetrated by the petitioner in *Alexander*–the petitioner defrauded the county of hundreds of thousands of dollars in real estate tax revenues. Lastly, we note the Administrator's concession in the case at bar that petitioner's misconduct is not sufficient of itself to justify denying the petition for reinstatement. In *Alexander*, the Administrator contended that the misconduct was so serious an offense that the petitioner's "reinstatement should be denied solely on that basis." *Alexander*, 128 Ill. 2d at 534.

The second factor under Rule 767(f) is the maturity and experience of the petitioner at the time discipline was imposed. The Hearing Board noted that petitioner was approximately 40 years old and had substantial experience in the work force and with city government when he began his first assignment with the Finance Committee. Although petitioner had been licensed to practice law for less than six years, the Hearing Board believed that factor to be irrelevant. The Hearing Board reasoned that "[a]nyone of sufficient age to be a part of the work force is capable of understanding that it is improper to receive financial and other compensation over a lengthy period of time without performing work to justify that compensation."

We agree with the Hearing Board that petitioner was sufficiently mature and experienced at the time discipline was imposed to understand that his actions in accepting wage payments and health insurance coverage and benefits from the various committees were improper.

The third factor under Rule 767(f) is whether the petitioner recognizes the nature and seriousness of the misconduct. The Hearing Board felt strongly that petitioner both recognized the nature and seriousness of his misconduct and deeply regretted his criminal actions:

> "At hearing, Petitioner expressed remorse for his misconduct and repeatedly acknowledged that his actions were wrong. We perceived those declarations to

be heartfelt and sincere. Moreover, numerous representatives of Moody Church, including both clergy and lay staff members, testified that since his release from prison Petitioner has openly disclosed his criminal conduct and has expressed genuine contrition for his illegal acts. Petitioner's overall demeanor conveyed humility, anguish over his past behavior, and an acceptance of total responsibility for his actions. In recognition of the fact that he has disgraced the legal profession, his family and the city taxpayers, Petitioner offered his apologies to each of those groups."

Having listened to petitioner's testimony for several hours, and having observed petitioner's behavior over the course of the hearing, the Hearing Board was uniquely positioned to determine that petitioner recognized the nature and seriousness of his misconduct. We agree with the Hearing Board's conclusion, and note that a review of the record leaves no doubt as to petitioner's brokenness and remorse over his criminal actions.

The fourth factor under Rule 767(f) is whether the petitioner has made restitution. "Although this court has stated that rehabilitation rather than restitution is the 'controlling' consideration (*In re Thomas* (1979), 76 Ill. 2d 185), restitution is nonetheless an important factor" (*Berkley*, 96 Ill. 2d at 412) in a reinstatement proceeding. The Hearing Board found that petitioner had made complete payment of restitution to the City of Chicago. We agree, and note further that petitioner completed restitution of the monies to the City of Chicago even before petitioner was indicted for his part in the ghost-payrolling arrangement. Indeed, petitioner made the restitution payments against the advice of his criminal counsel.

The fifth factor under Rule 767(f) is the petitioner's conduct since discipline was imposed. Here, also, we must agree with the Hearing Board's conclusion. The record indicates petitioner's conduct since discipline was imposed has been exemplary. We note that upon completion of the community service required by the sentencing order, petitioner volunteered at the hospital for an additional period of time. Petitioner also began volunteering at the Moody Church. His volunteer

activities and interaction with personnel at the Moody Church led to an offer of part-time employment. Petitioner showed that he was trustworthy and reliable in that role, leading to an offer of full-time employment with the church. Throughout his periods of employment with the Moody Church, petitioner has also volunteered in various ministries at the church, showing a willingness to extend his work day by several hours in order to help others and provide for their needs.

We also find that petitioner has a stellar reputation at the Moody Church. Staff members of the church testified that he is honest, trustworthy, reliable, cooperative, and attentive to the needs of others. The witnesses also commented that petitioner has a gentle spirit and a "servant's heart" and is a person of great humility. The senior pastor of the Moody Church testified that petitioner is a "different person" from the one who had participated in criminal activities and that petitioner is now a valued member of the church community who strongly believes in the redemptive power of God's work in his life. We believe that the evidence supports the Hearing Board's conclusion with respect to this particular factor.

The sixth factor under Rule 767(f) is the petitioner's candor and forthrightness in presenting evidence in support of the petition. The Hearing Board generally gave petitioner high marks for forthrightness, observing that "[m]uch of the information submitted by petitioner in conjunction with his petition, including his current assets and financial obligations, his past involvement in a civil action, his income tax disclosures and his employment history was not challenged by the Administrator as being inaccurate or misleading in any way." However, the Hearing Board was troubled by petitioner's testimony at the hearing as to the reasons petitioner allowed himself to remain on the city payroll for nearly seven years. Petitioner stated that he was told he would be assigned work "as needed" and he anticipated that he would receive work. The Hearing Board confessed itself "bewildered that someone with Petitioner's level of experience could continue to accept unearned paychecks for even one year, let alone seven years, without coming to the conclusion that the employment was a sham." The Hearing Board allowed "for the fact that Petitioner

may still be attempting to rationalize his behavior to himself," and reasoned, "[w]hile the benefit of hindsight allows us to be critical of Petitioner's explanations as to why he continued to accept paychecks, we cannot conclude with certainty that those explanations evidence a lack of candor on his part, particularly in light of his sincere acknowledgments of wrongdoing and his conscientious disclosure of information in his petition and in the remainder of his testimony."

The Administrator believes that the Hearing Board did not give proper weight to petitioner's "lack of candor." The Administrator notes that petitioner's misconduct spanned a number of years and employment with three different city committees. Also, according to the Administrator, petitioner tried to distance himself from blame when he testified that he expected work and stood ready to perform any assignments that he received. The Administrator contrasted petitioner's testimony to the admissions he made in the plea agreement leading to his conviction.

We find the proceedings in *Fleischman*, 135 Ill. 2d 488, particularly helpful in our review of the Hearing Board's finding. The petitioner in *Fleischman* testified in the federal trial of Stephen Gorny, an official of the board of tax appeals of Cook County, that he paid money to Gorny so that Gorny would read the petitioner's tax appeal files and "again if there were any close cases, if possibly he would interpret the documentation in favor of the client." Throughout the reinstatement proceedings, however, the petitioner adamantly maintained that the payments he made to Gorny and Robert Hosty, another official of the board of tax appeals, were not for the purpose of influencing their decisions, but rather for the purpose of inducing them to read the tax appeal files. The petitioner said he was convinced the board of tax appeals was not reading the files. He testified he paid the money, out of his own funds, so his clients could get fair hearings. In allowing reinstatement upon a showing of restitution, the court observed:

> "The Hearing Board found that petitioner was candid and forthright in his presentation of evidence before the Board. This is another factor which the Board is best able to apply, having viewed the petitioner while

testifying. Although we are troubled somewhat by petitioner's inability to satisfactorily reconcile his Federal testimony in the prosecutions of Gorny and Hosty with his contention in reinstatement proceedings to the effect he only paid money to influence the commissioners to read the files, petitioner unequivocally acknowledged that his conduct was 'a hundred percent wrong' and his testimony convinced the Board that petitioner *is* rehabilitated. We concur that reinstatement is appropriate." (Emphasis in original.) *Fleischman*, 135 Ill. 2d at 497.

In the present case, upon review of the entire record, we believe that the Hearing Board thoughtfully evaluated petitioner's candor, giving due consideration to this factor. Although the Hearing Board was troubled by one aspect of petitioner's testimony at the hearing, the Hearing Board could not conclude with certainty that petitioner's testimony evinced a lack of candor. The Hearing Board balanced petitioner's testimony regarding his expectation of work from the committees against petitioner's "sincere acknowledgments of wrongdoing and his conscientious disclosure of information in his petition and in the remainder of his testimony." The Hearing Board was able to observe petitioner over the course of a two-day hearing, and, in addition to the testimony regarding petitioner's expectation of work, heard petitioner's testimony regarding many facets of his life. The Hearing Board also heard testimony from several other witnesses regarding petitioner's character. "Given the nature of the evidence which petitioners usually present and the difficulty of accurately assessing the subjective qualities so important in a reinstatement case, this court has ordinarily given considerable weight to those findings of the hearing panel which represent an evaluation of the witnesses' credibility and the petitioner's candor, forthrightness and sincerity." *Berkley*, 96 Ill. 2d at 411.

We are also aware of petitioner's testimony at the reinstatement hearing that the plea agreement did not reflect his statements to the FBI that he expected work from each of the committees. Petitioner insisted that his testimony to the Hearing Board regarding the expected work assignments was

consistent with the statements he had made to the FBI. In a reinstatement proceeding, it is presumed that the petitioner participated in activities which justified his disbarment in the first instance. Thus, the petitioner stands to gain nothing in failing to admit the wrongdoing. In light of petitioner's testimony that he sought work assignments and was always told that he was "on call" and would receive assignments when needed, we cannot say that his testimony at the hearing evinced such a lack of candor that his petition should be denied.

Each petition for reinstatement is unique and requires an independent evaluation of the relevant circumstances. *Fleischman*, 135 Ill. 2d at 495 (citing *Alexander*, 128 Ill. 2d at 539, *In re Holz*, 125 Ill. 2d 546, 558 (1988), and *Polito*, 132 Ill. 2d at 301). The findings of the Hearing Board are, of course, advisory and not binding upon this court. *Wigoda*, 77 Ill. 2d at 158. However, as the court has recognized on numerous occasions, the findings of the Hearing Board are entitled to virtually the same weight as the findings of any initial trier of fact. *Cohen*, 83 Ill. 2d at 525; *Wigoda*, 77 Ill. 2d at 158. In the present case, we believe that the findings of the Hearing Board enjoy considerable support in the record, and we defer to those findings.

Considering the factors enumerated in Rule 767(f), we also believe that petitioner should be reinstated to the practice of law. Petitioner is remorseful about his misconduct and has endeavored, since his conviction, to live a life beyond reproach. Petitioner has shown convincingly that he is rehabilitated–that he has returned to a life that is beneficial, constructive and trustworthy. We do not by any means minimize the seriousness of petitioner's misconduct. We also agree with the Hearing Board and the Administrator that petitioner should have terminated his city employment much earlier than he did. We are cognizant, however, that petitioner went through a progression in his determination to discontinue his city employment and make restitution, that petitioner was deeply troubled by his employment with the committees, and that petitioner believed it would be difficult to extricate himself from the situation. Moreover, we note that rehabilitation is the most important consideration in a reinstatement proceeding.

We take into consideration petitioner's rehabilitation, his remorse over his misconduct, and his payment of restitution to the city in concluding that he should be reinstated to the practice of law.

## CONCLUSION

"Disciplinary proceedings are designed to safeguard the public, maintain the integrity of the profession and protect the administration of justice from reproach." *Wonais*, 78 Ill. 2d at 124 (citing *In re Saladino*, 71 Ill. 2d 263, 275 (1978), and *In re Nowak*, 62 Ill. 2d 279, 283 (1976)). In the present case, we believe that petitioner has shown by clear and convincing evidence that he is rehabilitated and is once more fit to practice law. Consequently, we adopt the recommendation of the Hearing Board and Review Board that petitioner be reinstated to the practice of law.

*Petition granted.*